**In re SCHERER HARDWARE AND SUPPLY, INC., an Illinois corporation, Debtor.**

**SCHERER HARDWARE AND SUPPLY, INC., Plaintiff,**

**v.**

**CHARLES H. EICHELKRAUT & SON, INC., Defendant.**

**Bankruptcy No. 78 B 10069.**

United States Bankruptcy Court, N. D. Illinois, E. D.

Feb. 12, 1981.

Gerald F. Munitz, Nachman, Munitz & Sweig, Chicago, Ill., for Scherer Hardware and Supply, Inc.

Warren, Hayner & Baxter, Ottawa, Ill., for Charles H. Eichelkraut & Sons, Inc.

## OPINION AND ORDER

RICHARD L. MERRICK, Bankruptcy Judge.

This cause came on to be heard on the objection of the debtor, Scherer Hardware and Supply, Inc. (hereinafter "Scherer"), to the claim of Charles H. Eichelkraut and Son, Inc. (hereinafter "Eichelkraut"), and on Scherer's counterclaim against Eichelkraut. The parties have presented a number of questions, both legal and factual, which will be discussed separately.

The major part of Eichelkraut's claim is for a payment for mailboxes that it made to one of Scherer's creditors. Eichelkraut claims this as a setoff against its debt to Scherer. The Court first must determine whether Eichelkraut's claim is allowable as a claim. Next the Court must determine into which class of claims it belongs, if it is allowable. If it is entitled to be treated as a setoff, Scherer's counterclaim must be determined to permit the establishment of the arithmetic amounts of the competing claims so that the portion of Eichelkraut's claim which can be set off may be calculated. The largest of Scherer's counterclaims is for "extras" incurred by Scherer while refitting bifold doors at the Streator Elderly Development at Streator, Illinois. Scherer also claims it is owed money for extra work on the "Foster Grant", "St. Bede's Abbey", "Illinois Trust", "Philadelphia Quartz", and "Frank Rowland" jobs. Finally, Scherer claims that it is entitled to interest on any amounts owed it by Eichelkraut.

### I. The Setoff

#### A. Findings of Fact

On October 15, 1976 La Salle National Bank as Trustee under Trust No. 51382, as owner, entered into a Master Construction Contract with Eichelkraut, as general contractor, for the construction of a project to be known as the Streator Elderly Development in Streator, Illinois. On November 2, 1976 Eichelkraut and Scherer entered into a Subcontract Agreement whereunder Scherer was to furnish and install 315 bi-fold doors at the Streator project. This agreement is the basis for Scherer's counterclaim and will be discussed later.

On November 3, 1976 Eichelkraut and Scherer entered into another subcontract whereunder Scherer was to furnish and install mailboxes at the Streator project. It is Eichelkraut's contention that it can set off the amount due to it for the mailboxes against the amount which it owes on the doors. In November 1976, Scherer placed its order for the mailboxes with Cutler-Federal, Inc. (hereinafter "Cutler"). On November 28, 1977, approximately one year later, Cutler drop-shipped the mailboxes to the Streator project. On November 29, 1977 Cutler billed Scherer for the cost of the mailboxes $1,801. Although Scherer did not pay Cutler, Cutler did not retain a security interest in the mailboxes, and Cutler thus became a general unsecured creditor of Scherer. Cutler did not cause a written notice of its claim to be served on Eichelkraut[1] or on the owner of the Strea-

---

1. Cutler eventually notified Eichelkraut of its claim in February, 1979, nearly two months after this Chapter XI case was initiated, and three months after the last delivery under its contract.

tor project. In addition, Cutler has never filed a claim for lien with the Recorder of Deeds in La Salle County, Illinois (the site of the Streator project) or with the Registrar of Titles in La Salle County, Illinois.

On January 18, 1978 and May 1, 1978 Scherer obtained payment from Eichelkraut on the mailbox contract by submitting the required lien waivers, which incorrectly stated that the mailboxes were paid for, and omitted Cutler's name as an unpaid supplier. Walter Scherer, the president of Scherer, testified it was his general practice in his dealings with Eichelkraut to submit lien waivers showing payment for labor and materials as having been made, even though that was not the case. The Court will' take judicial notice that it is a common practice of subcontractors to follow this procedure. Despite Eichelkraut's payment to it, Scherer did not pay Cutler at that time.

On December 28, 1978 Scherer filed its Petition for an Arrangement under Chapter XI of the Bankruptcy Act, beginning this case. About two months later, in February, 1979, Cutler finally notified Eichelkraut of its unpaid claim for the mailboxes. Eichelkraut then paid Cutler $1,801 and obtained a lien waiver and an assignment of the Cutler claim against Scherer.

### B. *Conclusions of Law*

Scherer objects to permitting Eichelkraut's claim for $1,801 to be treated as a setoff, which has considerable merit and will be discussed in detail below. Scherer also objects to the allowance of the $1,801 as a general unsecured claim, but without any legal analysis.

It is considered by all parties that Scherer received the mailboxes from Cutler, and that Scherer did not pay for the boxes. On the other hand Scherer was paid $2,888 by Eichelkraut, which was the contract price for providing and installing the boxes. On February 22, 1979, Eichelkraut paid to Cut-

ler the $1,801 selling price. Thus at the moment Cutler has sold the boxes and has received the full selling price. Scherer has received the price of the boxes, but has not paid for them. Eichelkraut has paid for the mailboxes twice; by partial payments on January 18, 1978, May 1, 1978, and June 2, 1978, Eichelkraut paid the total contract price to Scherer; on February 22, 1978, Eichelkraut paid the materials portion of the contract to Cutler directly.

By first addressing the issue of whether the $1,801 claimed by Eichelkraut could be set off against a larger amount owed by Eichelkraut to Scherer, the parties in their briefs became so involved in the intricacies of mechanics lien law that they overlooked simple contract law. Looking now at the issue as a matter of bankruptcy law, the issue is whether the $1,801 which is owed by Scherer to Eichelkraut shall be paid in 100¢ dollars (that is, treated as a setoff), or paid in 30¢ dollars (that is, treated as a general unsecured claim entitled to the same proportionate distribution as all other general unsecured claims under the confirmed reorganization plan).

Scherer objects to the proposed setoff of the $1,801 Eichelkraut paid Scherer because section 68(b) of the Bankruptcy Act prohibits a setoff in favor of any debtor of the bankrupt that "(2) was purchased by or transferred to him after the filing of the petition, or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy."

Eichelkraut contends that while its payment was made after the filing of Scherer's petition, and with knowledge of Scherer's insolvency, the payment should not be disallowed as a setoff because it does not fall within the limitations of section 68(b). Eichelkraut relies on two cases [2] as authority that not every purchase of a claim against a person known to be insolvent can be charged with having been purchased "with

2. *Bel Marin Driwall, Inc. v. Grover*, 470 F.2d 932 (9th Cir. 1972); *Mullins v. Noland Co.*, 406   F.Supp. 206 (N.D.Ga.1975).

a view to" using the claim as a setoff against the bankrupt. Specifically, the cited cases hold that where a debtor of the bankrupt paid a claim of one of the bankrupt's creditors, a setoff should be allowed if the claim had been acquired as the result of a direct or independent legal obligation.

■ The corollary is that the setoff should not be allowed if the payment had been made voluntarily and without compulsion. This doctrine is similar in concept to the more widely recognized principle that a non-governmental entity will be subrogated to the tax priority of § 64(a)(4) of the Bankruptcy Act only if it shall have made payment of the bankrupt's taxes under a legal obligation to make payment or under some other form of duress which would expose it to legal liability in the absence of payment of the tax by somebody. See Collier on Bankruptcy, ¶¶ 64.405, 64.408 (14th ed. 1978).

■ The principle, which might be called the "Doctrine of Priority through Payment under Compulsion", is followed generally in determining whether payments by a bankrupt shall be treated as a preference under § 60(a)(1), or whether payments by a third party of the debts of a bankrupt shall be entitled to setoff under § 68(a), both of which frequently are geared to mechanics liens. With respect to mechanics liens, the doctrine normally is interpreted to provide that payments to a supplier of labor or materials to eliminate or to prevent a mechanics lien:

(a) if made by the bankrupt, will not constitute a preference under § 60(a)(1) or

(b) if made by a creditor of the bankrupt, will not preclude a setoff under § 68(a)(2).

As a consequence, in cases of this nature the core issues usually are whether a mechanics lien had been or could be perfected and whether at the time of the payment the payer had an obligation to remove an existing mechanics lien or to prevent the creation of one.

The Doctrine of Priority through Payment under Compulsion is better understood in the tax circumstances of § 64(a)(4) because that entails a straight subrogation. If the creditor had an obligation to pay the taxes, under a surety bond, for example, the creditor is allowed to stand in the shoes of the tax authority. That direct derivative benefit of § 64(a)(4) does not pertain under § 60(a) and § 68(a), where the correlative benefit is indirect. If the payee had a mechanics lien, or was in the position to impose a mechanics lien which the payer was obligated to remove or to prevent, the payment to the payee would not be considered a preference nor a purchase. Under § 60(a)(1) it would be irrelevant that the payer was insolvent, that the payment was made within four months of bankruptcy and that the payee received a larger share of the estate than other creditors. Under § 68(b)(2) it would be irrelevant that the debtor was insolvent and that the claim was acquired by the creditor within four months of the filing for the purpose of use as a setoff. If the bankrupt had a legal mechanics lien duty on the one hand, or if the creditor had a legal mechanics lien duty on the other hand, fulfillment of that obligation would excuse the fact that the payment had the effect of producing a disproportionate recovery to the creditor. The fact that a duty was being exercised renders unimportant the motivation for performing that duty.

As shown in *Bel Marin Driwall, Inc. v. Grover*, 470 F.2d 932 (9th Cir. 1972) (hereinafter "*Bel Marin*"), which is factually similar to the instant case except on the question of notice, the independent legal obligation can come from two sources: from the threat of a mechanics lien encumbrance on the real estate or from a direct legal obligation of the general contractor, whether contractual or statutory, to pay all claims for labor and materials, regardless of the claimant's privity of contract with the general contractor. The Court will now consider those two factors and their application to the instant case.

A mechanics lien is a right of a supplier of labor or materials to obtain recourse against real estate improved by the labor or materials in the event that payment for the labor or materials is not made. It is an *in rem* proceeding which is separate from and independent of any *in personam* rights which the supplier might have against the owner, a contractor, or a sub-contractor, by way of contract or otherwise. Although varying from state to state, mechanics lien statutes normally provide that the supplier may have a lien against the subject property from the date of the contract or first delivery of labor or materials, provided that within a short period after final delivery a claim for lien is recorded properly, or that notice of lien is served upon the owner, or that a suit to enforce the lien has been instituted. Because the lien may take priority over an existing mortgage and other encumbrances, it is common for mortgages to provide that the creation and continuance of a mechanics lien upon the property constitutes an event of default under the mortgage.

Because of the dire consequences which might result to the owner of the property from the imposition of a mechanics lien, strict limitations have been placed upon the time and manner within which the lien claimant must proceed in order to retain his extraordinary remedies.

Turning to the relationship between the owner and the various levels of general contractors, sub-contractors and suppliers, we come to the subject of mechanics lien waivers, which are representations made by a contractor or sub-contractor seeking payment that all labor and materials supplied with respect to his contract have been paid for, or in the alternative that the laborers and suppliers have waived any claims which they might have to a mechanics lien. The purpose is to assure the person making payment that he will have to pay only once. Because so many of the contractors and sub-contractors are undercapitalized and can pay their suppliers only after receiving payment for the work performed, it is not uncommon for suppliers and sub-contractors to execute lien waivers before they

have been paid. In effect they are foregoing their lien protection as a business accommodation to their business associates.

Where the sub-contractor has not paid all of his suppliers and sub-contractors, he may furnish a list of unpaid suppliers and sub-contractors, showing amounts owed, to the contractor, who will pay them directly or withhold from the sub-contractor the amount owed until satisfactory lien waivers are supplied.

In many states it is a general rule that mechanics lien statutes must be strictly construed. 57 C.J.S., *Mechanics Liens*, § 4 (1948). Illinois is one of those states. Illinois courts have held that mechanics lien statutes are in derogation of the common law and must be strictly construed with reference to all the statutory requirements upon which the right to the lien depends. *M. L. Ensminger Co. v. Chicago Title & Trust Co.*, 74 Ill.App.3d 677, 30 Ill.Dec. 627, 393 N.E.2d 663 (1st Dist. 1979); *Components, Inc. v. Walter Kassuba Realty Co.*, 64 Ill.App.3d 140, 21 Ill.Dec. 107, 381 N.E.2d 42 (2d Dist. 1978); *Suddarth v. Rosen*, 81 Ill. App.2d 136, 224 N.E.2d 602 (2d Dist. 1967).

While the Illinois Mechanics Lien Statute, codified at 2 Ill.Rev.Stat. ch. 82 §§ 1–39 (1979), gives a material supplier (such as Cutler, in this case) the same lien rights as a sub-contractor, 2 Ill.Rev.Stat. ch. 82 § 21 (1979), it requires that a material supplier comply with the notice requirements in section 24. The supplier must give written notice of his claim to the owner of the construction project within 90 days after the last delivery of materials. 2 Ill.Rev. Stat. ch. 82 § 24 (1979). It can be said that by virtue of the statute, the supplier obtains an inchoate lien at the time the first delivery is made. This inchoate lien must be perfected by giving the required notice within 90 days of the last delivery or the inchoate lien will be extinguished. After a mechanics lien is perfected, the lien becomes actionable in a court of law.

A supplier who has properly perfected his lien by notice has three choices: (1)

file a claim for lien with the county land records; (2) begin an action in the circuit court to foreclose the lien; or (3) sue the owner and contractor jointly to obtain a personal judgment for the amount due. 2 Ill.Rev.Stat. ch. 82 § 28 (1979). Such suits must be commenced no later than two years after the last delivery of materials to the job. 2 Ill.Rev.Stat. ch. 82 § 9 (1979).

■ Eichelkraut argues in its brief that this law gave Cutler two years after delivery of the mailboxes to sue Eichelkraut or the owner which would have been the situation had Cutler given notice. Under such circumstances, the unpaid Cutler claim would have represented an ominous threat of future litigation. Actually Cutler had lost its right to sue on its inchoate lien or to pursue any of the other remedies given by the lien statute because it failed to perfect its lien with the requisite notice to the owner. Illinois courts have held that the notice requirements in the mechanics lien law are not mere technical requirements, but are mandatory and jurisdictional. *M. L. Ensminger Co. v. Chicago Title & Trust Co., supra.* Thus, Cutler did not represent a mechanics lien threat to the project.

While this may seem a harsh result for Eichelkraut, which bought Cutler's claim, the whole purpose of the notice requirement is to protect owners and contractors such as Eichelkraut from having to pay a claim twice. 26 Ill.L. & Prac., *Mechanics Liens,* § 96 (1956). Probably, if Eichelkraut had received notice from Cutler that it had not been paid for the mailboxes, Eichelkraut would not have paid Scherer for the mailboxes.

Eichelkraut contends in its brief that in *Bel Marin* "[e]ven though the paint supplier's lien had not been perfected under California law, there was still time to file a suit. . . ." to enforce its materialman's lien. But that was not the law in California at

the time of *Bel Marin* nor is it the law in Illinois now. Eichelkraut has misread the case [3] because the paint supplier did indeed perfect its lien. 470 F.2d at 934. California law is similar to that of Illinois in that it requires the sub-contractor to serve a written notice of claim and makes this a prerequisite to filing suit to enforce the lien. Cal. Civ.Proc.Code §§ 1193.1(c), 1200.1(d) (West) (now repealed); Cal.Civ.Code §§ 3097, 3114, 3240 (West) (present law).

To some extent Eichelkraut's brief appears to fail to differentiate between a suit under the mechanics lien law to enforce an *in rem* right and a suit under ordinary contract law to enforce an *in personam* right for damages. There is a two year period of limitations on the first, and a ten year period of limitations on the second.

■ Comparing the factual situation of *Bel Marin* with that of the instant case, we find that the supplier in *Bel Marin* had given the owner notice of its claim and thus was in a position to enforce its mechanics lien. Consequently, the contractor had to prevent the mechanics lien, which it did by making payment to the supplier. In the instant case, Cutler had not given notice and could not enforce its inchoate mechanics lien. Therefore, it was not necessary for the contractor to protect the owner from the supplier. But as Eichelkraut correctly states in its brief, the issue is "whether or not the general contractor had an independent obligation to discharge the claim of Cutler, not whether Cutler had a perfected lien." Eichelkraut did not have an independent obligation because Cutler no longer had mechanics lien rights.

Such a direct and independent obligation could be either statutory or contractual. In California this independent obligation was furnished by statute. In the *Bel Marin* case, under its performance bond the con-

---

**3.** In its brief, Eichelkraut supports its contention that a subcontractor could still file suit even if its lien had not been perfected with the following quote from *Bel Marin*: "Although the time for filing a lien against the work had expired, the time for filing suit against Summers or the bond had not." 470 F.2d at 935. It

is apparent from reading that passage that Eichelkraut has confused the required *notice* of claim which must be served on the general contractor and owner (in California) with the filing of a claim for lien with the county records. The court in *Bel Marin* is referring to the latter.

tractor had a legal liability to pay all materialmen and suppliers.[4] In the instant case, Eichelkraut did not have a performance bond. Although Eichelkraut had an obligation to protect the owner, there was no way that Cutler could sue the owner if the owner had paid the $1,801 to somebody. Otherwise Cutler could have sued the owner on a *quantum meruit* basis, but that is unimportant. The mechanics lien limitations are designed to keep any owner from having to pay twice for something; he should pay once for whatever he gets.

Although the California statute provided the contractor's independent obligation in the *Bel Marin* case, there is no such statute in Illinois, so any independent obligation of Eichelkraut to pay Cutler's claim would have to be contractual. The terms of Eichelkraut's contract with the owner of the Streator project thus become crucial to its argument:

Two sections of the Master Construction Contract govern Eichelkraut's liability for unpaid claims. Paragraph 12 states in part:

Authority may ... recapture ... any payment to Contractor, in whole or in part, to the extent that such action may be necessary to protect Owner from loss on account of: ...

(b) Claims for liens filed or reasonable evidence of probable filing of such claims;

(c) Failure of Contractor to make payments properly to Subcontractors or Materialmen for labor or materials....

Paragraph 14 provides in part:

Contractor assumes the entire responsibility and liability for losses, expenses, damages, demands and claims in connection with or arising out of ... the performance of the work by Contractor, Subcontractors, Sub-subcontractors and their respective agents, servants and employees ... and shall indemnify and hold harmless Owner and Authority ... from any and all such losses, expenses, damages

and claims, and shall defend ... [same] and shall pay all damages, costs and expenses, including attorney's fees in connection therewith or resulting therefrom.

Eichelkraut concludes that under these provisions it was contractually bound to satisfy the unpaid debt from Scherer to Cutler. Its situation, it contends, is analogous to the one in *Bel Marin* in which the general contractor was required by law to satisfy the supplier's claim. The principal difference between the two cases is that in the *Bel Marin* case the supplier had perfected his lien and might have enforced it if he had not been paid. In the instant case the supplier has not perfected its lien because it has not given notice and thus it may proceed only as a matter of contract law.

Eichelkraut did not have to pay Cutler to protect the owner against Cutler because Cutler would have no cause of action against the owner except upon a *quantum meruit* theory if the owner had the benefit of the mailboxes without having made payment for them. The owner could not expect Eichelkraut to pay for the mailboxes without having received payment itself, so that Paragraph 12 necessarily is limited to situations where the owner would be exposed to having to make payment for something where it did not receive commensurate value.

Paragraph 14 of the Contract is a standard indemnity clause requiring Eichelkraut to assume all liability for losses, damages, demands and claims arising out of the Streator project. While the clause made the Cutler claim Eichelkraut's responsibility rather than the owner's, it did not change Eichelkraut's degree of liability on the Cutler claim. A careful analysis by Eichelkraut would have shown that Cutler had two ways to obtain payment for its mailboxes: Cutler could have sued Scherer on its contract for the mailboxes, or it could

4. The California mechanics lien law in effect at the time of the *Bel Marin* case said that the general contractor's bond shall be conditioned on the payment of all claims of laborers and materialmen. Cal.Civ.Proc.Code § 1185.1(c) (West) (now repealed; Cal.Civ.Code §§ 3235, 3236 (West; present law). The court in *Bel Marin* found that this obligation of the contractor was "independent of the duty of the bankrupt (the subcontractor) to pay for materials furnished him." 470 F.2d at 935.

have impressed a materialman's lien on the Streator project to obtain payment from ·Eichelkraut or the owner. Because Cutler failed to perfect its lien, it lost all of its remedies under the mechanics lien law; its only recourse was against Scherer on the contract. A *quantum meruit* proceeding was not a real threat. If the owner had paid anybody, it would have no liability. If it had not paid anybody, it would have received fair value. This means that Eichelkraut's liability to Cutler was minimal, if any. In relation to other combined creditors and debtors of Scherer, Eichelkraut hoped to obtain a windfall by paying only its net debt to Scherer while others paid the gross debt and received back a fractional dividend. The Court concludes that Eichelkraut's claim of $1,801 should not be allowed as a setoff, but should be allowed as a general unsecured claim in the same amount.

## II.  *Remainder of Eichelkraut Claim*

### A.  *Findings of Fact*

Pursuant to its contract of November 2, 1977 to furnish and install bifold doors at the Streator project, Scherer had its supplier drop-ship the doors at the construction site. The doors arrived by truck and Eichelkraut's workers unloaded the truck for Scherer. On other occasions, Eichelkraut's workers hoisted the doors to the proper floors of the building and distributed the doors within the building. Eichelkraut billed Scherer for his labor on three separate invoices dated September 16, 1977, November 16, 1977 and November 30, 1977. The total of these charges for labor was $467.44. Scherer does not dispute this claim and acknowledges it to be a proper setoff.

### B.  *Conclusions of Law*

██  The Court finds Eichelkraut's claim against Scherer for the amount of $467.44 to be proper, and because this was a part of the larger transaction of installing the doors, it constitutes, along with Scherer's counterclaim for installation, the type of mutual debt and mutual credit permitted as a setoff under § 68(a). It is allowed in full

and will be set-off against the counterclaim of Scherer discussed below.

## III.  *Scherer's Counterclaim for Reworking Doors at Streator*

██  On November 2, 1977 Eichelkraut and Scherer entered into a Subcontract Agreement whereunder Scherer was to furnish and install bifold doors at the Streator project. Another subcontractor, the Levy Company (hereinafter "Levy"), was retained to do the drywall work. Levy was to prepare openings in the walls to accommodate the doors to be installed later by Scherer. Although specifications for the openings were furnished to Levy, a large number of openings did not conform to the specifications; more often than not, the openings were too narrow at the top and were not rectangular. As a result the doors, which were pre-cut and pre-finished, did not fit the openings and had to be cut down.

On or about November 22, 1977 Eichelkraut asked Scherer to alter the doors so that they could be installed in the existing openings. This work was not provided for in the Subcontract Agreement between Scherer and Eichelkraut for installing the doors, and thus constituted an "extra", as such work is known in the construction industry. Before beginning the "extra" work on the doors, Scherer submitted an Additional Work Authorization dated November 22, 1977, to Eichelkraut, which proposed a charge of $40 per· door for reworking two-panel doors and $20 per door for reworking one-panel doors.

Although the Subcontract Agreement specified a written authorization from Eichelkraut before Scherer began any "extra" work, Eichelkraut did not give this written authorization. Later, a representative of Eichelkraut's office, Frank Rowland, refused to pay Scherer's $4,300 price. Nevertheless, Eichelkraut's superintendent at the Streator project, Owen McWhorter, had given Scherer's representative at the project, Seymour Guyaux, oral authoriza-

tion to begin reworking the doors.[5] Scherer then reworked and installed the doors, at which time there was not a formal agreement between Scherer and Eichelkraut as to the price of the "extra" work. Eichelkraut contends that it was to be on a time and materials basis, Scherer that is was governed by the additional work authorization which he had submitted.

Two prices have been suggested. Scherer's bid of $40 per door for reworking 71 one-panel doors forms the basis for its counterclaim against Eichelkraut of $4,300. Eichelkraut introduced into evidence a time study showing that 55 minutes were required to rework a two-panel door and 35 minutes to rework a one-panel door. This results in a total time of 106.5 hours for reworking the doors, and by multiplying the estimated hours by an hourly rate of $16.51 per hour, Eichelkraut arrives at a figure of $1,758.31. Thus while both parties agree that Eichelkraut owes Scherer money for reworking the doors, they are far apart on the amount.

The Eichelkraut time study does not indicate whether the sample doors used were easy, difficult, or average. The nature of adjustments required varied considerably, but the two principal shortcomings of the door openings were that they were too narrow at the top and that they were not rectangular. More importantly, however, the time study did not take account of the fact that there was only one room on each floor where carpentry was permitted. Thus each door had to be carried to the carpentry room for reworking and then returned.

Walter Scherer testified that he had discussed the cost of reworking the doors with Frank Rowland, of Eichelkraut's staff and advised him that Scherer did not want to rework the doors on a time and materials basis because of the expense in keeping track of how much time was spent on each door. He submitted a written bid to Eichelkraut to do the work for a flat price of $20 for each single panel door and $40 for each double panel door. 71 one-panel doors at

$20 and 72 two-panel doors at $40 were billed to Eichelkraut for a total of $4,300, and never paid.

The contract between Scherer and Eichelkraut provided that no extra work was to be performed by Scherer without the written authorization of Eichelkraut. Owen McWhorter, project superintendent of Eichelkraut and Gerald Eichelkraut, president of Eichelkraut, both testified that they had told Scherer representatives to proceed with the work but had not discussed with them the method of calculating the cost of the work.

Walter Scherer was a very credible witness. He testified that on a number of occasions in the past he had done extra work on subcontracts with Eichelkraut on the basis of oral approval and had always been paid without question. This, combined with the fact that he had told Eichelkraut that he would not work on a time and materials basis, provides convincing evidence that the parties contemplated that the work would be done by Scherer according to his bid of $20 for single doors and $40 for double doors. Scherer was in a strong bargaining position at the time because installation of the doors was the final work to be done in completing the entire project, so that there was pressure on Eichelkraut to get it done quickly.

### IV. *Scherer's Counterclaim for Miscellaneous "Extras"*

#### A. *Findings of Fact*

At the "Foster Grant" job Scherer's men were idled for three hours while they waited for another subcontractor to cut concrete curbing so that Scherer could install a door at the project. Scherer billed Eichelkraut $46.14 for the three hours down-time on this job. On the "St. Bede's Abbey" job Scherer sent an extra coordinator to the job at the request of Eichelkraut. Scherer billed Eichelkraut $42 for this "extra." On the "Illinois Trust" job Scherer required a lock cylinder on an aluminum door. This was not covered by its agree-

5. Evidence was presented that Scherer had performed "extra" work for Eichelkraut on previ-

ous occasions on the basis of oral, rather than written, authorization.

ment with Eichelkraut, and thus constituted an "extra." Scherer billed Eichelkraut $22.50 for this. On the "Philadelphia Quartz" job Scherer had contracted to furnish and install an overhead door. This door required "backing" and "spring pads." Although Scherer's contract with Eichelkraut did not specifically exclude backing and spring pads, Scherer's bid on the job did not include these. At Eichelkraut's request, Scherer provided the backing and spring pads and charged Eichelkraut $96.60 for the extra labor and materials. In addition, one of Eichelkraut's employees, Frank Rowland, ordered a door from Scherer for use in Rowland's own house. Rowland told Scherer to charge the door to Eichelkraut. Scherer delivered the door to Rowland's premises and billed Eichelkraut for $58.56.

The Court finds that all of the "extras" billed by Scherer were proven as having been performed. Thus the recapitulation of the claims of Eichelkraut and the counterclaims of Scherer is as follows:

| (a) | 1. | Award for reworking doors | $4,300.00 | |
| | | Setoff for unloading doors | − 467.44 | |
| | | | 3,832.56 | |
| | 2. | Foster Grant | 46.14 | |
| | 3. | St. Bede's Abbey | 42.00 | |
| | 4. | Illinois Trust | 22.50 | |
| | 5. | Philadelphia Quartz | 96.60 | |
| | 6. | Frank Rowland | 58.56 | |
| | | | $4,098.36 | |
| (b) | | Award to Eichelkraut (mailboxes) | 1,801.00 | (gen. unsec. claim) |

### V. Interest

### A. Conclusions of Law

Scherer's argument for awarding interest on its claim is not persuasive. The high cost of money notwithstanding, the only ground for granting such an award is the state interest statute that allows interest on "money withheld by an unreasonable and vexatious delay of payment." Ill.Rev. Stat. ch. 74, § 2 (1979). In this case the delay in payment results from a good faith dispute about the amount due. Illinois courts generally have held that where the amount depends largely upon the construction placed on the terms of a contract, or upon questions of fact about which there is room for a difference of opinion the plaintiff is not entitled to interest. *Watson*

*Lumber Co. v. Gruennewig, supra,* 79 Ill. App.2d 377, 397, 226 N.E.2d 270, 280 (1967); *O'Heron v. American Bridge of New York,* 177 Ill.App. 405 (1st Dist. 1913). Thus neither party to this cause is entitled to interest on the amounts due to it.

### ORDER

Judgment is entered against Eichelkraut in the amount of $4,098.36. The claim of Eichelkraut for the cost of the mailboxes is allowed as a general unsecured claim in the amount of $1,801.