**RITZ–CRAFT CORP.**

v.

**STANFORD MANAGEMENT GROUP, et al.**

**Civ. No. Y–91–2249.**

United States District Court, D. Maryland.

Sept. 1, 1992.

Suzanne L. Hood, Easton, Md., and J. David Smith, Williamsport, Pennsylvania, for plaintiff.

Murray L. Deutchman, Rockville, Md., for defendants.

## MEMORANDUM

JOSEPH H. YOUNG, Senior District Court Judge.

Ritz–Craft Corporation, Inc. ("Ritz–Craft" or plaintiff) seeks to recover sums allegedly due from Stanford Management Group, Inc. ("SMG"), and Woods Crossings Limited Partnership, on a contract for the manufacture, delivery and installation of pre-fabricated housing units.[1]  A court trial

---

1. The parties agree that Woods Crossings was not a party to the contract, and thus cannot be held liable for a breach of the contract.  All claims against Woods Crossings Limited Partnership will be dismissed.

**1314**

was held on April 20, 1990, and the parties have filed post-trial memoranda in support of their respective claims.

### FACTS

On August 22, 1989, Ritz–Craft and SMG entered into a written contract to manufacture and install pre-fabricated multi-family housing units at an apartment development in Cambridge, Maryland. Paul John Jr., general manager for Ritz–Craft, testified that during negotiations, SMG was advised that Ritz–Craft had no experience in the manufacture of multi-family homes. SMG was satisfied, however, with the quality of residential homes and duplexes manufactured by Ritz–Craft in the past.

The contract called for Ritz–Craft to manufacture the units, arrange for them to be delivered and set on foundations built by SMG, and provide certain "finish work" for the units. SMG would provide electrical hook-up, plumbing hook-ups, heating, ventilation, air conditioning systems and appliances. SMG was also responsible for preparing the foundations, and providing access to the foundations.

A prototype unit was delivered to the work site in January, 1990. The prototype was designed to ensure that each unit would be built according to specification. John Newsome, one of the owners of SMG, and a general partner in Woods Crossing, testified that SMG inspected the prototype and made some minor changes. General production of the units began the first week in January, 1990, and Ritz–Craft began shipping the units in the second week of January.

Forty-nine multi-family units were to be delivered at a total contract price of $1,613,500. Two contract modifications were executed by the parties increasing the total contract price to $1,670,750. On November 17, 1989, the parties executed a modification that increased the contract price by $12,250, and provided for a five percent retainage on each unit to be withheld as a "completion guarantee." The $12,250 increase would cover certain required "specification changes."

In February and March, the work site was shut down for approximately 35 days due to inclement weather. The delays precipitated substantial cost overruns, and resulted in the second contract modification increasing the total price of the contract by $45,000. When work resumed, conditions were still poor, and morale was low. A substantial amount of water caused by melting snow, had accumulated in the crawl spaces beneath the foundations of the buildings. In a letter to SMG, John explained that as the water vaporized, it was absorbed into the wood above causing the floor sheathings to swell and buckle, and nails to pop so that they can be felt under foot through the carpet. The moisture could also cause structural lumber warpage or decay leading to problems with other building systems such as insulation, air conditioning and plumbing. In several of the crawl spaces, the water was several inches deep, and the workers were experiencing electric shock as they tried to work with their equipment. John asked that SMG arrange to have the water removed, but SMG took no action and the problem went uncorrected.

SMG was responsible for site preparation and had a duty to insure access to the foundations, and that all foundations would be in place. SMG also agreed to provide electrical wiring and water. When the first units arrived, the land was wet and muddy. Many of the foundations were not in place, there was no electrical wiring or water on site, and no roads had been installed as anticipated. Because of the slippery conditions, Ritz–Craft was unable to use their customary equipment to transport the units. Instead, Ritz–Craft obtained a large tractor to lift the units and place them on their foundations. John testified that in some cases, as the unit was placed on top of the foundation, the central pillar would sink causing stress cracks to form in the walls and ceilings. Ritz–Craft incurred additional expenses due to the wetlands problem and because there were no hard surfaces.

Soon thereafter, the parties discovered that the plumbing fixtures installed on each unit did not conform to specification.

Sunrise Plumbing and Heating, Inc. ("Sunrise") was hired by SMG in the fall of 1989 to perform SMG's plumbing obligations under the contract. Sunrise took on the added task of replacing the non-conforming fixtures. Both Ritz–Craft and SMG refused to pay Sunrise, and Sunrise placed a lien on the property.

John testified that Sunrise was hired by SMG, and that Ritz–Craft did not give its authorization for Sunrise to perform the additional work. Ritz–Craft also contends that SMG authorized the work without giving Ritz–Craft the opportunity to substitute conforming fixtures, as required by the contract.[2] This testimony is substantiated by a letter from Sunrise Plumbing to SMG dated May, 1990. The letter states:

> Re: Additional Work for Ritz Craft Corp.... I have repeatedly asked for a signed additional work authorization from Ritz–Craft ... but to date have received nothing. As you are aware a significant amount of this work has already been completed ... We are not prepared to do any more until we get the proper documents from those responsible for payment.... You informed me on 5/17/90 that Ritz–Craft thought our price was too high and that we are not to do any more of the additional work as they are going to send there [sic] own people to complete it....

Nevertheless, Sunrise completed the additional work and billed both Ritz–Craft and SMG for the work. Gregory Sloditskie, Ritz–Craft's assistant production engineer testified that Ritz–Craft could have made the plumbing changes for half of what Sunrise charged.

On June 26, 1990, officials from SMG and Ritz–Craft held a meeting to discuss the "plumbing problem." The terms of the subcontract between Sunrise and SMG required Sunrise to obtain a "change order" and written authorization before performing additional work. At the meeting between SMG and Ritz–Craft, an official of

SMG is purported to have said "screw him [Sunrise]—he doesn't have any change order in writing and no written authorization from us to do work. His contract states that he must, so let him lien us."

On September 21, 1990, Sunrise filed a lien against the project to recover sums due in the amount of $21,257.20. SMG and Sunrise eventually settled the claim for $15,900. Ritz–Craft was not a party to either the lien proceedings or the settlement.

Ritz–Craft substantially completed its obligations under the contract on May 18, 1990, as evidenced by two certificates of substantial completion. Attached to each certificate of completion was a final inspection "punch list" of items that needed to be done in order to effect final completion of the project. These items were completed, and full possession of the units passed to SMG in August, 1990.

By July, 1990, all sums on the contract had been paid except a 5% retainage withheld as a guarantee of completion on each unit, and the $45,000 contract modification sum. On July 9, 1990, Ritz–Craft signed a "waiver of lien" releasing any claim of right to a lien on the project for labor and material. The waiver form was faxed to Paul John Sr., president and general manager of Ritz–Craft, with a note explaining that the waiver would apply only to the "5% retainage on what [SMG] had already paid...." In consideration of the waiver, SMG was to pay Ritz–Craft a sum of $76,000. In August, 1990, SMG released a first payment of $20,000 towards the $76,000 retainage figure. On August 10, Ritz–Craft sent SMG an invoice requesting payment of the $45,000 contract modification. Although SMG did not respond, a final payment of $36,000 was made on September 26, 1990.

Ritz–Craft filed suit for the balance of the contract price including the $45,000 modification, on August 12, 1992. The total contract price, inclusive of sums added

---

**2.** Addendum C of the contract provides in part: SMG's sole and exclusive remedy for any defect, non-conformity, or breach of warranty with respect to any of the goods sold by Ritz– Craft under this contract shall be limited to the repair or replacement, at Ritz–Craft's sole discretion, of the defective or non-conforming item in question.

by modification, is $1,670,750. Of that total price, Ritz–Craft has received payment of $1,605,302.50. Ritz–Craft asserts a claim for the outstanding balance of the total contract price—$65,447.50—and for certain additional overages in the amount of $48,000. SMG contends that Ritz–Craft is not entitled to the $45,000 agreed to in the second modification because the waiver of lien was intended to act as an accord and satisfaction of the contract modification. In the alternative, SMG argues that payment of the $45,000 modification sum was conditioned upon receipt of final construction lending funds from the bank, a condition that has not been met. SMG also contends that all sums, except "retainage" in the amount of $20,000, have been paid. The $20,000 retainage was withheld purportedly to cover the cost of work performed by Sunrise Plumbing at the request of Ritz–Craft, to cure defects in the housing units caused by Ritz–Craft. SMG claims set-off for the cost of the additional work, plus attorneys fees in the amount of $25,245.[3]

### The Second Contract Modification

SMG contends that Ritz–Craft is not entitled to payment under the second contract modification because, (1) the waiver of lien signed by Ritz–Craft in July, 1990 acted as an accord and satisfaction of the balance due on the entire contract, (2) the modification was not under seal and without consideration, and (3) SMG's obligations under the modification never matured because of the failure of a condition precedent. The second modification provides:

> [t]his modification amends the Contract between SMG and Ritz–Craft, pursuant to paragraph 12 of the original Contract, dated August 22, 1988, to memorialize SMG's agreement to pay Ritz–Craft additional amounts as reflected below. In consideration of the parties' obligations and agreement, SMG and Ritz–Craft agree that SMG shall pay an additional $45,000.00 to Ritz–Craft due to cost overruns arising during the course of the

project.... The $45,000.00 shall be paid by SMG to Ritz–Craft immediately upon the Bank's release of final construction lending funds to SMG, which should occur on or about May 15, 1990.

A detail of the specific cost overruns referred to in the addendum where not put in writing. The modification was made pursuant to paragraph 12 of the original contract which provides, "[s]hould [ ] delays or damages caused by SMG or its Agents result in higher costs to Ritz–Craft then Ritz–Craft reserves the right to pass these overages on to SMG, and SMG agrees to pay Ritz–Craft for the overages."

### 1. Accord and Satisfaction

■ At trial, and in post trial pleadings, SMG raised the affirmative defense of accord and satisfaction. SMG claims that the waiver of lien agreement signed by plaintiff in July, 1990, was intended to satisfy the balance due under the contract, including retainage and the $45,000 modification. Rule 8(c), Fed.R.Civ.P., requires that the affirmative defense of accord and satisfaction be set forth in responsive pleadings. *See, e.g., Marx & Co. v. Diners' Club, Inc.,* 400 F.Supp. 581, 585 (S.D.N.Y.1975). Failure to do so ordinarily results in the waiver of the defense and the exclusion of all evidence relevant only to it. *Depositors Trust Company v. Slobusky,* 692 F.2d 205, 208 (1st Cir.1982); 5 Wright & Miller, Federal Practice & Procedure § 1278 (1969 & Supp.1982).

Although an affirmative defense may be tried with the implied consent of the parties, Fed.R.Civ.P. 15(b); *Gallegos v. Stokes,* 593 F.2d 372, 375 (10th Cir.1979), no consent was granted. Ritz–Craft repeatedly objected at trial to SMG's attempts to introduce evidence concerning this affirmative defense. SMG's attempt to raise this defense at trial, therefore, must be rejected.

### 2. Consideration

■ SMG contends that the modification is invalid because it is not under seal, and

---

**3.** SMG claims $15,900 for the additional work, plus $9,345 in attorneys fees. The attorneys' fees were purportedly incurred defending the

lien action filed by Sunrise Plumbing and Heating, Inc. against the project.

contains no reference to consideration. A contract to supply pre-manufactured housing units to a buyer is a contract for the sale of goods, and is governed by the Maryland Uniform Commercial Code (the "UCC"). Md.Comm.Law Code.Ann. §§ 2–101, *et seq.* Goods are defined as all things (including specially manufactured goods) which are movable at the time of identification. Md..[Comm.] Cd.Ann. § 2–105. The modular units installed by Ritz–Craft were manufactured off-site at plaintiff's factory. Since they were manufactured to the buyer's specifications, the time of identification was at the first step in production, at which time the modular homes were movable. Md. [Comm.] Cd.Ann. § 2–105. *See also, Norwest Bank Billings v. Murnion,* 210 Mont. 417, 684 P.2d 1067 (1984) (holding that modular homes manufactured to specification, fall within the definition of movable goods provided by the UCC.) Thus, at the moment of their identification to the contract, the units were movable "goods" within section § 2–105 of the UCC. *See e.g., Lewis v. Hughes,* 276 Md. 247, 346 A.2d 231 (1975) (holding that a mobile home falls within the definition of "movable goods" provided by the UCC.); *Lakeside Bridge & Steel Co. v. Mountain State Constr. Co.,* 400 F.Supp. 273 (E.D.Wis. 1975) (holding that materials supplied by the plaintiff to the defendant for use in building a dam were manufactured by the plaintiff in Wisconsin and shipped to the defendant in Virginia, and thus were "movable goods" within the UCC.) *Accord, Morrow v. New Moon Homes, Inc.,* 548 P.2d 279 (Alaska 1976) (mobile homes); *Pierce–Odom, Inc. v. Evenson,* 5 Ark.App. 67, 632 S.W.2d 247 (1982) (mobile home); *Jones v. Abriani,* 169 Ind.App. 556, 350 N.E.2d 635 (1976) (mobile home).

▪ The fact that this transaction has ingredients of both a sale and a service, does not change its character as a contract for the sale of goods. *See, e.g., Burton v. Artery Co.,* 279 Md. 94, 367 A.2d 935 (1977). *Snyder v. Herbert Greenbaum & Associates, Inc.,* 38 Md.App. 144, 380 A.2d

618 (1977). In *Burton,* a contract to "furnish, supply, provide and deliver all labor, supervision, tools, equipment, plant material and perform all the work and services required for the completion of … landscaping and sod" for an apartment complex, was deemed to be a contract for the sale of goods under the UCC. *Burton,* 367 A.2d at 936. Similarly, while the contract here does contain an element of service, i.e. performance of certain "finish work" by Ritz–Craft, the sale function predominates, and the contract is thus one for the sale of goods within the UCC.

▪ An agreement modifying a contract for the sale of goods within the UCC, needs no consideration to be binding—Md. Code [Comm] Ann. § 2–209—nor is there a requirement that the document be under seal. The modification was duly executed by authorized representatives of both parties and thus constitutes a valid modification to the terms of the contract.

3. Condition Precedent

▪ Finally, SMG asserts that payment of the $45,000 modification was 'conditioned upon' the release of final construction lending funds to SMG, an event that purportedly never occurred because of the "poor condition of the project and failure of Ritz–Craft to finish the punch-out list."[4] The relevant language of the second modification provides "[t]he $45,000.00 shall be paid by SMG to Ritz–Craft immediately upon the Bank's release of final construction lending funds to SMG, which should occur on or about May 15, 1990." The question is whether this language was intended by the parties to make payment to Ritz–Craft contingent upon receipt of funds, or merely designed to postpone payment by SMG of the contract modification price for a reasonable time to afford SMG an opportunity to obtain the necessary funds. The answer is clearly the latter.

By analogy to construction contracts, the general rule is that a "pay-when-paid" pro-

---

**4.** A condition precedent is an event, other than mere lapse of time, which, unless excused, must exist or occur before the duty of immediate

performance of a promise arises. *Chirichella v. Erwin,* 310 A.2d 555, 270 Md. 178 (1973).

vision, will not operate to make payment contingent upon receipt of funds from a third party. *Aesco Steel, Inc. v. J.A. Jones Construction Co.,* 621 F.Supp. 1576 (E.D.La.1985); *Statesville Roofing & Heating Co. v. Duncan,* 702 F.Supp. 118 (W.D.N.C.1988); *A.J. Wolfe Co. v. Baltimore Contractors, Inc.,* 355 Mass. 361, 244 N.E.2d 717 (1969). In *A.J. Wolfe,* a Massachusetts case, the contract facially provided for the subcontractor to be paid within thirty days of payment to the general contractor. The court held:

> ... In the absence of a clear provision that payment to the subcontractor is to be directly contingent upon the receipt by the general contractor of payment from the owner, such a provision should be viewed only as postponing payment by the general contractor for a reasonable time after requisition ... so as to afford the general contractor an opportunity to obtain funds from the owner.

*Id.* 244 N.E.2d at p. 720. In *Thos. J. Dyer Co. v. Bishop International Engineering Co.,* the Sixth Circuit stated:

> In our opinion, [the five-day clause] is a reasonable provision designed to postpone payment for a reasonable period of [time] after the work was completed, during which the general contractor would be afforded the opportunity of procuring from the owner the funds necessary to pay the subcontractor.... To construe it as requiring the subcontractor to wait to be paid [until the general contractor] has been paid by the owner, [an event that] may never occur, is to give to [the subcontract] an unreasonable construction which the parties did not intend at the time the subcontract was entered into.

303 F.2d 655, 661 (6th Cir.1962). SMG's promise to pay the $45,000 in the second modification, is one of absolute liability. The language 'conditioning' payment upon receipt of final construction financing was chosen merely as a means of establishing a convenient time for payment. Upon failure of the event, the law implies a promise to pay within a reasonable time.

Having established that the second modification provides for final payment within a reasonable period of time, the discussion turns to whether such a period of time has elapsed. What constitutes a reasonable time for performance of a contractual obligation must be determined by the circumstances of the particular case. The intent of the parties is an important factor in this determination. With respect to final payment, the original contract provides that final payment is due "upon final inspection and signing of final 'Punch Out' list by both SMG and Ritz–Craft."

SMG issued two certificates of substantial completion, indicating that the units were substantially complete as of May 18, 1990. The certificates provided that SMG would assume full possession of the units by 12:00 noon on August 9, 1990 and August 18, 1990. Attached to these certificates were two "punch out" or "Final Inspection" check lists. SMG presented testimony at trial that the two lists were completed.

Paragraph seven of the contract provides "SMG agrees that no person or persons will occupy the modular units as living quarters until Ritz–Craft has received payment in full for the modular unit." John Newsome testified at trial, that the units have an occupancy rate of 93%. Thus, while the precise date for payment need not be determined, it is clear that the parties intended for payment to be made no later than late August, 1990.[5]

### Sunrise Plumbing

SMG contends that all sums, save "retainage" in the amount of $20,000, have been paid. The $20,000 retainage was withheld purportedly to cover the cost of work performed by Sunrise Plumbing at the request of, and due to defects in the construction of the housing units caused by Ritz–Craft. SMG contends that the work was authorized by Ritz–Craft, and thus

---

**5.** SMG concedes that it was subsequently able to obtain financing from another bank. SMG's

continued refusal to pay cannot be tolerated.

Ritz–Craft is responsible for payment. The Sunrise claim was eventually settled for $15,900. SMG claims set-off against Ritz–Craft in that amount, and attorneys fees in the amount of $9,345 purportedly incurred defending the mechanics lien filed by Sunrise against the project. In support, SMG cites the following case law: *Philadelphia, B. & W.R. Co. v. Roberts*, 134 Md. 398, 106 A. 615 (1919); *McGaw v. Acker, Merrall & Condit Co.*, 111 Md. 153, 73 A. 731 (1909); *Fowler v. Benton*, 245 Md. 540, 226 A.2d 556, *cert. den.* 389 U.S. 851, 88 S.Ct. 42, 19 L.Ed.2d 119 (1967). These cases hold generally that a party to a contract is entitled to recover money paid for the debt of another. Where the wrongful acts of another lead to collateral litigation, the aggrieved party may also recover attorneys' fees. For the reasons discussed below, these cases are inapposite.

With respect to plumbing, the original contract called for Ritz–Craft to provide water and waste lines "to be installed and connected under [the] floor." The pipelines were to be shipped loose on a per unit basis, and installed by SMG or SMG's contractor. SMG retained Sunrise to perform the work. In the course of this work, Sunrise discovered that the "sanitary traps" under the bathtubs were not connected, and that the water lines shipped by Ritz–Craft did not conform to specifications, or comply with Maryland Code requirements.

Nick O'Connell, a representative of Sunrise, testified at trial that he received verbal authorization from Ritz–Craft to perform the additional work required to correct these problems. The Court notes that O'Connell's credibility is compromised by the fact that he was paid $2,000 to testify as a non-expert on behalf of SMG. His testimony was directly contradicted by the testimony of several Ritz–Craft employees. Gregory Sloditskie, Ritz–Craft's assistant production engineer, testified that upon discovering that Sunrise was doing the additional work, he instructed them to stop. In a letter from Sunrise to SMG dated May, 1990, Sunrise admits that after repeated requests, Ritz–Craft refused to sign for the additional work. Although Sunrise now argues that Ritz–Craft was the responsible party, Sunrise did not name Ritz–Craft as a party to the mechanic's lien proceedings filed in state court, and Ritz–Craft was not a party to the ultimate settlement.

SMG contends further that the additional work performed by Sunrise, was originally Ritz–Craft's responsibility and thus SMG is entitled to a set-off. Ritz–Craft concedes that the water lines provided for the project did not conform to specification, but argues that the remaining work done by Sunrise was not Ritz–Craft's responsibility. Ritz–Craft notified SMG of its intention to cure the non-conforming fixtures, and the evidence is unclear as to why Sunrise nevertheless proceeded to perform the additional work.

The contract provides:

SMG's sole and exclusive remedy for any defect, non-conformity, or breach of warranty with respect to any of the goods sold by Ritz–Craft under this contract shall be limited to the repair or replacement, at Ritz–Craft's sole discretion, of the defective or nonconforming item in question.

Under the Maryland Uniform Commercial Code, a seller, upon seasonable notification to the buyer, is entitled to cure a nonconformity by making a conforming delivery, within the time for performance provided in the contract. Md.Cd.Ann [Commercial Law] § 2–508. The evidence is clear that Ritz–Craft did not authorize Sunrise to perform the additional work, and that Ritz–Craft was not given an opportunity to correct the nonconformity as required by the contract and the UCC.

A party cannot avail itself of the right to set-off unless it has a legally subsisting cause of action in its favor on which it could maintain an independent action. *Ghingher v. Fanseen*, 172 A. 75, 166 Md. 519 (1934). In light of the exclusive remedy provision set forth in the contract, SMG would have no independent claim against Ritz–Craft for the additional cost. Accordingly, SMG is not entitled to set-off. The cases relied upon by SMG in support of this claim are inapposite.

**1320**

*Ritz–Craft's Claim for Overages*

 In addition to the balance due under the contract, Ritz–Craft argues that it is entitled to overages in the amount of $48,000 pursuant to paragraph 12 of the contract, which provides:

> Ritz–Craft shall in good faith attempt to adhere to the construction schedule SMG has requested. Should, however, delays or damages caused by SMG or its Agents result in higher costs to Ritz–Craft then Ritz–Craft reserves the right to pass these overages on to SMG, and SMG agrees to pay Ritz–Craft for the overages.

Ritz–Craft contends that the overages claimed were directly attributable to SMG's failure to have the site adequately prepared for setting the units; allowing severe moisture conditions to continue unabated; damage to the interiors of the units caused by other SMG contractors; disorganized and improper sequencing of the contractors' work; and excessive demands with respect to work. At trial, the Johns testified that Ritz–Craft was called upon to perform additional services after completing the final inspection punch lists, in order to get the units prepared for the opening. Ritz–Craft claims cost overruns in the amount of $34,000 for labor, $12,000 for benefits, $16,000 for meals and lodging, and $2,000 for other travel expenses, and in support, submits an expense ledger detailing those costs. Ritz–Craft estimates that 75% or $48,000 of these cost overruns was caused by SMG. This figure is a conservative estimate, and does not include a claim for materials purchased by Ritz–Craft and used in completing the additional work.

The language of paragraph 12 is clear. Where delay and damage are due to the actions of SMG or its agents, SMG must bear the additional costs. Though the testimony presented at trial is conflicting, the hard evidence in support of Ritz–Craft's claim for overages is largely undisputed. Thus, the Court is satisfied that Ritz–Craft is entitled under the Contract to be reimbursed by SMG for cost overruns amounting to $48,000.

The findings of fact and conclusions of law herein are made in accordance with rule 52, Fed.R.Civ.P., whether or not so specifically identified.