In re DAVIDSON LUMBER
SALES, INC., Debtor.

ZIONS FIRST NATIONAL
BANK, N.A., Appellee,

v.

CHRISTIANSEN BROTHERS,
INC., Appellant,

and

Jacobsen–Robbins Construction.

No. 94–4017.

United States Court of Appeals,
Tenth Circuit.

Sept. 19, 1995.

Bryce D. Panzer, of Blackburn & Stoll, L.C., Salt Lake City, Utah, for defendant-appellant.

J. Randall Call (James A. Boevers and Sally B. McMinimee, with him on the brief),

of Prince, Yeates & Geldzahler, Salt Lake City, Utah, for plaintiff-appellee.

Before SEYMOUR, Chief Judge, MOORE, Circuit Judge, and SAFFELS,* District Judge.

SEYMOUR, Chief Judge.

Zions First National Bank (Zions) brought this adversary proceeding against Christiansen Brothers Inc. (Christiansen). Zions had a perfected security interest in the accounts receivable of debtor Davidson Lumber Sales, Inc. (Davidson) and sought to enforce that interest out of accounts receivable Christiansen allegedly owed Davidson. The bankruptcy court granted summary judgment to Christiansen, ruling that Christiansen owed Davidson nothing by virtue of Christiansen's payment of debts that Davidson owed to its suppliers, Diehl Lumber Products (Diehl) and Anderson Lumber (Anderson). Zions appealed to the district court which reversed, holding that Christiansen's payment of Davidson's debts did not relieve Christiansen of its obligation to pay Davidson. *See Zions First Nat'l Bank, N.A. v. Christiansen Bros. Inc. (In re Davidson Lumber Sales, Inc.),* 164 B.R. 773 (D.Utah 1993). The district court accordingly granted summary judgment for Zions. Christiansen appeals, and we reverse.

I.

The relevant facts underlying this litigation are undisputed and may be briefly stated as follows. Davidson filed a petition under Chapter 11 of the Bankruptcy Code on February 6, 1986. The case was converted to a Chapter 7 proceeding on April 30, 1987. On February 21, 1986, Davidson and Zions entered into a post-petition financing agreement under which Zions obtained a security interest in Davidson's accounts receivable. Zions filed a financing statement in this regard under the Utah provisions of the Uniform Commercial Code (UCC).

Christiansen, as the general contractor on a construction project, bought goods and materials from Davidson post-petition for use on the project. Davidson in turn bought material from Diehl and Anderson and resold it to Christiansen for use in the project. Christiansen was contractually obligated to the owner of the project to deliver the project free of mechanics liens. Davidson did not pay Diehl and Anderson for the materials. On February 24, 1987, Christiansen issued a joint check to Anderson and Davidson as payment for the materials Davidson had purchased from Anderson and resold to Christiansen. Davidson's president endorsed the check. On February 27, 1987, Diehl filed a notice of mechanics lien on the project under state law based on its lack of payment. Christiansen and Diehl entered into an agreement on March 11, 1987, under which Diehl agreed to release the lien and Christiansen agreed to pay Diehl the amounts Davidson owed Diehl for the material Diehl sold to Davidson for use on the project. Christiansen paid Diehl, and Diehl released the lien. In a letter dated March 13, 1987, Davidson wrote to Christiansen stating that Zions had a security interest in Davidson's accounts receivable. Davidson further stated that it declined to authorize payment of these accounts to anyone but the bankruptcy estate.

II.

In reviewing a bankruptcy court decision, the district court accepts fact findings unless clearly erroneous and reviews conclusions of law de novo. *See Bartmann v. Maverick Tube Corp.,* 853 F.2d 1540, 1543 (10th Cir.1988). We likewise review a bankruptcy court's factual determinations for clear error and its legal determinations de novo. *Id.* We agree with the parties that no material fact disputes exist and that we are called upon to review only legal issues.

The bankruptcy court based its decision on its conclusion that, under Utah law, Christiansen's payments as a general contractor to suppliers who had not been paid by Davidson, the subcontractor, created a de-

---

* Honorable Dale E. Saffels, United States Senior District Judge for the District of Kansas, sitting by designation.

**1564**

fense to Christiansen's obligation to pay Davidson. The district court disagreed, concluding that nothing in applicable Utah statutes allows a general contractor to extinguish its obligation to a subcontractor by paying directly the subcontractor's creditors. Accordingly, we turn first to Utah law.

■■■ Utah recognizes the principle of setoff,[1] under which a defendant may assert a counterclaim against a plaintiff "to be used in full or partial satisfaction of whatever is owed." *Mark VII Fin. Consultants Corp. v. Smedley*, 792 P.2d 130, 133 (Utah Ct.App. 1990). The court in *Mark VII* held that as a general rule setoff is only warranted when the demands between the parties are mutual. *Id.* at 133 (citing 80 C.J.S. *Set-Off and Counterclaim* § 48a(2) (1953); 20 Am.Jur.2d *Counterclaim, Recoupment, and Setoff* § 74 (1965)). As support for that proposition, the court cited authorities which also recognize that a court in equity may permit setoff even when the debts are not mutual in order to effect equity and prevent injustice. *See* 80 C.J.S. *Set-Off and Counterclaim* at § 48(b), 20 Am.Jur.2d *Counterclaim, Recoupment, and Setoff* at § 75.[2] Although we have found no decision of the Utah courts addressing whether setoff is available under the circumstances here, we have found no indication in Utah law that setoff would be barred in these circumstances.

■■■ Moreover, the Utah courts recognize that the statutes providing for mechanics liens and payment bonds are remedial in nature and are designed to protect suppliers from the contract privity requirement. *See Cox Rock Prods. v. Walker Pipeline Constr.*, 754 P.2d 672, 673–74 (Utah Ct.App.1988). To achieve the protective purposes of these statutes, the Utah courts construe them broadly. *See Richards v. Security Pac. Nat'l Bank*, 849 P.2d 606, 610 (Utah Ct.App.), *cert. denied*, 859 P.2d 585 (Utah 1993). Accordingly, the courts have held as a matter of policy that as between a commercial lender and a lienholder,

> [g]iven the legislature's creation of a specific statutory preference for mechanics' lienholders, if the question is framed as a choice between which party should receive a windfall, we believe it should be the mechanics' lienholder.... Given the statutory protection granted mechanics' lienholders, it is much more appropriate to have commercial lenders bear the burden of protecting themselves.

*Id.* at 612. Although the specific holdings in these cases arose out of fact situations distinguishable from those at issue here, absent otherwise controlling Utah authority the policy in the cases favoring lienholders at the expense of commercial lenders inform our determination of the way in which the Utah courts would resolve the issues before us.[3] In keeping with the concern of the Utah courts and legislature that lienholders recover payment for material they have supplied,

---

**1.** The parties and the district court have addressed to varying degrees whether the facts in this case give rise to a claim of setoff or of recoupment. *See Zions First Nat'l Bank, N.A. v. Christiansen Bros., Inc. (In re Davidson Lumber Sales, Inc.)*, 164 B.R. 773 n. 2 (D.Utah 1993). The Bankruptcy Code distinguishes between setoff and recoupment, imposing more impediments to the availability of setoff. *See Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1536–37 (10th Cir.1990). We do not resolve this issue. Instead, in concluding that Christiansen is not obligated to Zions, we assume that we are dealing with the issue of setoff, the assumption less favorable to Christiansen.

**2.** Although we believe the Utah courts would allow setoff absent mutuality when equitable considerations are present, we note in addition that several well-defined exceptions exist to a strict construction of the mutuality requirement, including the setoff of creditor claims under the doctrine of subrogation. *See J.A. Clark Mechanical, Inc. v. Case W. Reserve Univ. (In re J.A. Clark Mech., Inc.)*, 80 B.R. 430, 432 (Bankr.N.D.Ohio 1987) (citing cases). " 'Mutuality is evident because the surety's claim for reimbursement and the debtor's debt are owing between the same parties.' " *Id.* (quoting 4 *Collier on Bankruptcy* ¶ 553.04(5) (15th ed. 1987)).

**3.** An additional indication of the concern in Utah that the law provide for the payment of laborers and suppliers is found in *Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382 (Utah 1989). There the court held that when two parties reach a contractual agreement that one party will pay debts arising from the furnishing of labor or materials, the suppliers are third party beneficiaries of that contract with an enforceable right to payment against the contracting party assuming the payment obligation. *See id.* at 1385–87.

we conclude that Utah would permit a general contractor who pays a supplier in order to prevent or to discharge a lien to set that payment off against amounts it owes to the defaulting subcontractor.[4]

■ Zions argues that even if Christiansen had a right to setoff, that right was subordinate to Zions' perfected security interest in Davidson's accounts receivable. We disagree. Section 9–104(i) of the Utah version of the UCC, Utah Code Ann. § 70A–9–104(i),[5] states that Article 9 does not apply to any right to setoff. *See Insley Mfg. Corp. v. Draper Bank & Trust*, 717 P.2d 1341, 1344 (Utah 1986). Utah has joined the majority of jurisdictions construing this provision by holding that a creditor may have a right to setoff without complying with the security agreement and filing provisions of Article 9, although the priority of such a setoff is to be determined under that Article's priority provisions. *Id.* at 1344–45.[6]

■ The relative rights of account debtors and assignees of accounts receivable are set out in section 9–318 of the UCC. Under that provision the rights of the assignee, here Zions, are subject to "any ... de-fense or claim of the account debtor [here Christiansen] against the assignor [here Davidson] which accrues before the account debtor receives notification of the assignment." Utah Code Ann. § 70A–9–318(1)(b). Contrary to Zions' assertion, Zions as assignee bears the burden of proving that Christiansen received notice of the assignments so as to cut off Christiansen's right to set off those payments against the account debt. *See 4447 Assocs. v. First Sec. Fin.*, 889 P.2d 467, 470–71 (Utah Ct.App.1995) (citing cases). Also contrary to Zions' assertion, filing a financing statement does not provide the actual notice required under section 9–318.

While filing a financing statement is constructive notice that is effective for other purposes under Article 9, *see* Utah Code Ann. § 70A–9–312(5)(a) (1990) (establishing priority among multiple security interests by date of filing), *it does not suffice for the actual notice required under section 70A–9–318.* A financing statement only offers notice that a security interest may exist, and requires potential creditors to make further inquiry to confirm the existence of specific details of the transaction. *See Sannerud v. First Nat'l Bank,*

---

4. Zions argues that the Utah provisions relevant to the payment of construction funds undercut Christiansen's right to setoff. *See* Utah Code Ann. §§ 58–55–602, –603 (Supp.1994). These statutes provide that a contractor must pay his suppliers "within 30 consecutive days after receiving construction funds from ... another contractor ... or after the last day payment is due under the terms of the billing, whichever is later." *Id.* 58–55–603(2). Zions argues that because Christiansen never paid Davidson, Davidson's duty to pay Diehl and Anderson never arose. However, all the participants in the underlying events, including Davidson and Zions, have agreed throughout this litigation that Davidson owed the money to these suppliers. Moreover, with respect to construction contracts, the general rule is that such pay-when-paid provisions do not operate as conditions precedent under which the duty to pay is contingent upon receipt of funds from a third party. *See Ritz-Craft Corp. v. Stanford Management Group*, 800 F.Supp. 1312, 1317–18 (D.Md.1992) (citing cases). To the contrary, these provisions are viewed as only postponing payment for a reasonable time and merely establishing a convenient time for payment. *Id.*

5. All further references herein to Uniform Commercial Code sections are contained in Utah Code Ann. tit. 70A.

6. Zions' reliance upon *Insley Mfg. Corp.* is thus misplaced. As set out in text, *Insley* holds that although section 9–104(i) removes a setoff from the security and filing provisions otherwise imposed by Article 9, the priority provisions of that Article are to be used in determining the priority of a right to setoff vis-a-vis the claims of other creditors. *See Insley*, 717 P.2d at 1344–45. In that case, the court followed its holding in resolving the priority conflict between a creditor's perfected purchase money security interest in inventory and identifiable cash proceeds and a creditor's right to setoff against those proceeds. It is in this context that the court noted the importance of the constructive notice given by the filing of a financing statement, and stated that Article 9 has no provision suggesting that a perfected security interest [in inventory and proceeds] is subordinate to a right of setoff. *Id.* at 1345.

In the instant case, as distinguished from *Insley*, we must look to Article 9 to resolve a priority conflict between a creditor's right to setoff and another creditor's perfected security interest in accounts receivable, an issue resolved directly by UCC section 9–318.

708 P.2d 1236, 1241 (Wyo.1985); U.C.C. § 9–402 cmt. 2 (1989). An account debtor, unlike a potential creditor, is not obligated to check the UCC recordings continually to ascertain whether the debt has been assigned, and *the filed financing statement offers no actual notice of the assignment's existence that would affect an account debtor's right to assert subsequent claims and defenses. See* Utah Code Ann. § 70A–9–318(1)(b) (1990); *Chase Manhattan Bank v. State,* 40 N.Y.2d 590, 388 N.Y.S.2d 896, 898–99, 357 N.E.2d 366, 369 (1976) *(financing statement not actual notice that would bar account debtor from asserting setoff).*

*Id.* at 473 n. 9 (emphasis added).

The only evidence in this record relevant to the notice issue is the letter from Davidson to Christiansen dated March 13, 1987. Even assuming that this letter would constitute sufficient notice under section 9–318(1)(b), *see 4447 Assocs.,* 889 P.2d at 472–75, the letter was dated after Christiansen's agreement to pay Diehl and after Christiansen issued the joint check to Anderson and Davidson. Because Christiansen's claim for setoff arose before it received the notice, if any, provided by the March 13 letter, Zions' rights as assignee are subject to that claim.[7]

### III.

Zions further argues that allowing setoff here would violate several provisions of the Bankruptcy Code, specifically those pertaining to post-petition financing, use of cash collateral, setoff, and the automatic stay. We begin our consideration of these claims by turning to a long line of cases addressing these and similar arguments in the context of the construction industry. This authority provides a framework for evaluating Zions assertions and supports our determination that the Utah courts would allow setoff in this situation.

The court in *Selby v. Ford Motor Co.,* 590 F.2d 642 (6th Cir.1979), discussed at length the special problems that arise with respect to payment down the line in the construction industry. The court pointed out that the Michigan trust fund statute at issue there was

> designed to remedy problems in the construction industry. Like the law merchant of an earlier day, the building trades have gradually created a set of commercial expectations as the result of the customs and practices of the industry. The nature of the industry is such that the commercial expectations of the parties are defeated when a building contractor or subcontractor does not use accounts paid to him on a job to pay subcontractors or materialmen. Unless the parties see that construction funds are properly applied down the line, the liabilities of the parties up the line are affected. The unpaid workers must undertake the lengthy and wasteful process of filing, perfecting and foreclosing on their mechanics liens. The owner's property and the construction lender's security are encumbered.

*Id.* at 647. The court observed that to preserve the economic viability of the multi-tier payment system used in the construction industry,

> courts and legislatures have increasingly found that the parties have an independent legal duty arising from reasonable commercial expectations to see to the proper application of construction funds. In the absence of statute, courts have declared that construction funds in the hands of a contractor are held subject to a constructive trust or an equitable assignment or an equitable lien. Even in the absence of a state builders trust statute, federal bankruptcy courts in a variety of situations have refused to apply the property, preference and statutory liens sections of the Bankruptcy Act to favor unsecured credi-

---

7. Zions argues that Christiansen, as Diehl's subrogee, should be charged with Diehl's notice of the assignment, citing the Colorado case of *Union Ins. Co. v. RCA Corp.,* 724 P.2d 80 (Colo.Ct. App.1986). That case is irrelevant both because it construed Colorado law and because it was not concerned with the particular notice require-

ments of section 9–318. The Utah courts have made it clear that section 9–318 requires actual notice to the account debtor, Christiansen. *See 4447 Assocs.,* 889 P.2d at 473 n. 9. In these circumstances, Diehl's notice is not notice to Christiansen.

tors over the equitable claims of subcontractors and materialmen to the proceeds of a construction project in the hands of a bankrupt contractor.

*Id.* at 648 (footnotes omitted).[8]

One of the earliest cases in this area arose out of a factual setting very similar to that before us. The court was required to determine "whether direct payments by the bankrupt's debtor (a general contractor) to the bankrupt's creditor (a supplier to the bankrupt), made under obligation of California law, were invalid as setoffs" under the prior Bankruptcy Act. *Bel Marin Driwall, Inc. v. Grover (In re Bel Marin Driwall, Inc.),* 470 F.2d 932, 933 (9th Cir.1972). Under the California law applicable at the time, "a general contractor and his surety were subject to judgment in favor of unpaid materialmen and suppliers." *Id.* at 935. The court pointed out that the general contractor thus paid the suppliers pursuant to a mandatory obligation imposed by statute which existed independently of any duty which the bankrupt subcontractor owed to those suppliers to pay for materials furnished to him. *Id.* The court held that when payment is made pursuant to such an independent legal obligation, setoff is proper. *Id.* at 935–36.

In *Scherer Hardware & Supply, Inc. v. Charles H. Eichelkraut & Son, Inc. (In re Scherer Hardware & Supply, Inc.),* 9 B.R. 125 (Bankr.N.D.Ill.1981), the court also addressed whether a general contractor who pays a bankrupt subcontractor's supplier pursuant to an independent legal duty may set this payment off against the debt owed to the subcontractor. The court recognized that according to the holding in *Bel Marin,* "where a debtor of the bankrupt paid a claim of one of the bankrupt's creditors, a setoff should be allowed if the claim had been acquired as the result of a direct or independent legal obligation." *In re Scherer,* 9 B.R. at 129. The court further held that under *Bel Marin,* the requisite independent legal obligation can come from the general con-

tractor's direct legal duty, "whether contractual or statutory, to pay all claims for labor and materials, regardless of the claimant's privity of contract with the general contractor." *Id.* Subsequent cases have similarly held in the bankruptcy context that where a general contractor pays suppliers pursuant to an independent legal obligation imposed *either* by statute or by contract, the general contractor may set that debt off against amounts owing to the subcontractor. *See, e.g., Stoebner v. Horizon Fabricators, Inc.,* 153 B.R. 840 (D.Minn.); *In re E. & D. Elec. Co., Inc.,* 68 B.R. 3 (Bankr.S.D.Miss.1986); *In re Flanagan Bros., Inc.,* 47 B.R. 299 (Bankr.D.N.J.1985).

Equally significant to our consideration of Zions' arguments are those cases holding that when a general contractor pays a supplier on the basis of an independent legal obligation, those payments do not become part of the bankruptcy estate. *See e.g., Crocker v. Braid Elec. Co. (In re Arnold),* 908 F.2d 52, 56 (6th Cir.1990); *Shaw Indus., Inc. v. Gill (In re Flooring Concepts, Inc.),* 37 B.R. 957, 961 (9th Cir. BAP 1984); *Rieser v. Bruck Plastics Co. (In re Trinity Plastics, Inc.),* 138 B.R. 203, 207 (Bankr.S.D.Ohio 1992). The case of *Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962 (5th Cir.1983), upon which both the district court and Zions rely, is distinguishable in significant respects and therefore does not compel a different result. In *Sigma,* the court considered whether a constructive trust existed under the applicable state law in funds owed to a general contractor in favor of that contractor's unpaid suppliers. The court held that even if a trust existed, because the debtor had legal title to the funds they became part of the estate subject to the suppliers' equitable interest under 11 U.S.C. § 541(a), (d). *See Sigma,* 712 F.2d at 964–68. *But see Begier v. I.R.S.,* 496 U.S. 53, 59, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that

---

**8.** We realize that the funds at issue here were in the hands of the general contractor, Christiansen, rather than held by the bankrupt subcontractor, Davidson. We are also aware that Zions

is a secured creditor. Nonetheless, the general concerns underlying the discussion in *Selby* are relevant to the instant circumstance.

interest is not 'property of the estate.' ").
The court in *Sigma* further held that no
constructive trust arose under state law in
any event. Significantly, the court's discus-
sion was directed only to the argument that
the funds were not part of the estate because
they were subject to a constructive trust.
The court did not address the line of cases
holding that payments made by a debtor's
debtor to that debtor's creditor under an
independent obligation are not part of the
bankruptcy estate.[9]

 Considering Zions' arguments in
light of the above authority, we first note
that Christiansen paid Diehl and Anderson
as the result of an independent legal duty
imposed by the contract between Christian-
sen and the project owner. It is undisputed
that this contract obligated Christiansen to
deliver the project free from liens, an obli-
gation that required Christiansen to pay the
suppliers in the event Davidson did not so as
to prevent the suppliers from filing liens.
The Utah courts have held that a contract
provision materially similar to this one ren-
ders the suppliers third party beneficiaries
with a right to claim directly against the
contract obligor. *See Ron Case Roofing &
Asphalt Paving, Inc. v. Blomquist,* 773 P.2d
1382, 1385–87 (Utah 1989). Consequently,
the payments made by Christiansen to the
suppliers are generally considered by the
authorities cited above to be available for
setoff against the debt Christiansen owed the

bankrupt, and are not considered part of the
bankruptcy estate.[10]

 With the above principles in
mind, we turn to Zions' argument that Chris-
tiansen violated 11 U.S.C. § 363(c)(2) by us-
ing the cash collateral attributable to the
accounts receivable it owed Davidson to pay
the suppliers without the consent of Zions or
the bankruptcy court. Section 363(c)(2) pro-
vides that "[t]he trustee may not use, sell, or
lease cash collateral under paragraph (1) of
this subsection unless—(A) each entity that
has an interest in such cash collateral con-
sents; or (B) the court, after notice and a
hearing, authorizes such use, sale, or lease in
accordance with the provisions of this sec-
tion." Cash collateral is defined as "cash,
negotiable instruments, documents of title,
securities, deposit accounts, or other cash
equivalents whenever acquired *in which the
estate* and an entity other than the estate
have an interest and includes the proceeds,
products, offspring, rents, or profits of prop-
erty subject to a security interest." 11
U.S.C. § 363(a) (emphasis added). As em-
phasized in the quoted definition, this section
is not applicable unless the debtor has an
interest in the property. As we have dis-
cussed, when a general contractor makes a
payment to a supplier under an independent
legal obligation, that payment is not part of
the bankruptcy estate and the debtor there-
fore has no interest in it. *See In re Arnold,*
908 F.2d at 55–56. Accordingly, Christian-
sen's payment did not violate section

---

9. At least two courts have held that when a
subcontractor is obligated by a contract with the
general contractor to supply materials and fails
to pay his suppliers, he has breached his contract
and the general contractor is no longer contrac-
tually obligated to pay the defaulting subcontrac-
tor. *See Tri–City Serv. Dist. v. Pacific Marine
Dredging & Constr. (In re Pacific Marine Dredging
& Constr.),* 79 B.R. 924, 929 (Bankr.D.Or.1987);
*Business Fin. Servs. v. Butler & Booth Dev. Co.,*
147 Ariz. 510, 711 P.2d 649, 651–52 (Ct.App.
1985). Under these holdings, the subcontractor
has no legal or equitable interest in funds held by
the general contractor. *See In re Pacific Marine,*
79 B.R. at 929. Accordingly, such funds are not
part of the bankruptcy estate and the security
interest of the subcontractor's creditor cannot
attach to them. *Id.*

10. The funds paid by Christiansen to Anderson
by joint check are also excluded from the bank-
ruptcy estate under the doctrine of earmarking.
It is generally recognized that where the payee
controls the application of the funds by requir-
ing dual endorsement before the check can be
negotiated, the funds are claimed to be ear-
marked funds on the specific condition that a
joint payee shall receive the proceeds, the
Debtor who is already a named payee is merely
deemed to be a conduit for those funds, which
did not become the property of the Debtor's
estate.
*Jensen v. Pen Air Conditioning, Inc. (In re Winsco
Builders, Inc.),* 156 B.R. 98, 100–01 (Bankr.
M.D.Fla.1993); *see also Rieser v. Bruck Plastics
Co. (In re Trinity Plastics, Inc.),* 138 B.R. 203,
204, 206–07 & n. 1 (Bankr.S.D.Ohio 1992); *see
generally McCuskey v. National Bank of Waterloo*

363(c)(2).[11]

■ Zions also argues that allowing setoff here would violate the automatic stay provisions of 11 U.S.C. § 362(a)(3) and (4). Under those provisions, the filing of a bankruptcy petition operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," 11 U.S.C. § 362(a)(3), and to stay "any act to create, perfect, or enforce any lien against property of the estate," *id.* § 362(a)(4).[12]

■ Zions' security interest, Christiansen's debt to Davidson, Davidson's debt to the suppliers, and Christiansen's payments to those suppliers all arose after Davidson filed its Chapter 11 petition. We are thus concerned here only with the availability of setoff with respect to post-petition obligations. The Bankruptcy Code does not address setoff in these circumstances. Section 553, which governs the availability of setoff, is directed to mutual debts that arose before the commencement of the bankruptcy proceeding. *See* 11 U.S.C. § 553(a). The automatic stay section deals with setoff specifically, but it is likewise addressed only to a debt owed the debtor that arose before the case was filed. *See* 11 U.S.C. § 362(a)(7).[13]

Despite the Bankruptcy Code's failure to address the situation, courts generally recognize that in appropriate circumstances mutual post-petition debts may be set off. *See e.g., Mohawk Indus. v. United States (In re Mohawk Indus.),* 82 B.R. 174, 178–79 (Bankr. D.Mass.1987); *Paris v. Transamerica Ins. Group (In re Buckley & Assocs. Ins., Inc.),* 78 B.R. 155, 158 (E.D.Tenn.1987); *Dery v.*

*General Motors Corp. (In re Fordson Eng'g Corp.),* 25 B.R. 506, 511 (Bankr.E.D.Mich. 1982); *In re Shoppers Paradise, Inc.,* 8 B.R. 271, 277–78 (Bankr.S.D.N.Y.1980). In considering the availability of setoff, the above-cited cases do not address whether the setoff would be subject to the stay imposed by section 362(a)(3) on acts to obtain possession of property of the estate or to exercise control over such property.

■ Even if we assume that section 362(a)(3) could apply to the setoff of mutual post-petition obligations, we do not believe Zions may invoke its protection here. The primary function of section 362(a)(7), which as we have observed applies by its terms to the setoff of a prepetition debt, "is to permit rehabilitation of Chapter 11 debtors." *Row Steel, Inc. v. Asphalt & Sealers Equip. Mfg. (In re Row Steel, Inc),* 33 B.R. 20, 22 (Bankr. E.D.N.C.1983). "[I]f the right to set-off will not substantially interfere with the debtor's reorganization effort and has been obtained in good faith, equitable considerations favor lifting the automatic stay to allow set-off." *Id.* at 23. The automatic stay is thus intended to promote the purposes of the Bankruptcy Code in rehabilitating Chapter 11 debtors. Presumably the same considerations would apply to the application of section 362(a)(3) to post-petition setoff. "Property acquired by the debtor post-bankruptcy must be used for the benefit of all unsecured creditors or for the debtor's benefit in reorganizing or for the debtor's fresh start." *USBI Co. v. Otha C. Jean & Assocs., Inc. (In re Otha C. Jean & Assocs.),* 152 B.R. 219, 221 (Bankr.E.D.Tenn. 1993).

*(In re Bohlen Enters., Ltd.),* 859 F.2d 561, 565 (8th Cir.1988).

11. Even if we assume that the payments made here could constitute property of the estate, section 363(c)(2) is directed only to the *trustee's* use of cash collateral. Zions has cited no authority for its assertion that this section also applies to parties other than the trustee. We believe that Zions' attempt to invoke section 363(c)(2) is actually a variation on its arguments with respect to other provisions of the Bankruptcy Code dealing with setoff and the automatic stay which we address below.

12. We do not see the relevance of section 362(a)(4). It is clear that Diehl filed a lien against the property. Although this lien precip-

itated Christiansen's payment to Diehl due to the independent legal obligation imposed upon Christiansen by contract, the lien itself did not attach to property of the debtor. Accordingly, we address Zions' argument only with respect to section 362(a)(3).

13. The district court therefore erred in holding that the setoff here was barred by 11 U.S.C. § 362(a)(7). *See In re Davidson Lumber Sales, Inc.,* 164 B.R. at 776 n. 2. That provision by its terms only applies when the debt to the debtor arose before commencement of the bankruptcy proceeding.

The court in *Otha C. Jean* refused to allow a bank to invoke the provisions of section 553 to prevent a setoff when allowing setoff would not "violate the reasons behind the rules expressed or implied" by that section. *Id.* at 222; *see also Flanagan Bros., Inc.*, 47 B.R. at 303 (refusing to bar setoff under section 553 when bar would be contrary to intent behind that section). Here, as in *Otha C. Jean,* denying the right to setoff would not increase the funds available to pay unsecured claims or give the debtor the use of the money for reorganization or for a fresh start. The setoff would at most only affect an asset, the accounts receivable assigned to the bank, which would otherwise not be available for any of the purposes underlying the automatic stay. Here, too, denying setoff on the basis of the automatic stay "will give [Zions] an advantage based on bankruptcy law for no reason related to the bankruptcy case. [Zions] should not get a windfall because [Davidson] happened to file bankruptcy. The result should be controlled by the law that would control outside of bankruptcy." *Otha C. Jean,* 152 B.R. at 222.

As we discussed in part I *supra,* Zions did not avail itself of the state law protection provided in section 9–318 of the U.C.C. by giving timely notice of the assignment to Christiansen. Zions' rights in the accounts receivable are therefore subject to Christiansen's right to setoff. We are not inclined to allow Zions, a sophisticated commercial lender, to invoke the provisions of the automatic stay simply to obtain relief from its failure to act in a commercially prudent manner. It is not appropriate to apply provisions of the Bankruptcy Code to override priorities established by state law and to contravene state public policy when to do so would not further the purposes of the Code provisions at issue.

▪▪▪ The above discussion is also dispositive of Zions' argument that it should prevail on the basis of 11 U.S.C. § 348(d). Under that provision, when a bankruptcy case is converted from a Chapter 11 proceeding to one under Chapter 7, a claim "against the estate or the debtor that arises after the order for relief but before conversion ... shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition." This provision is significant in the context of a claim to setoff because "[a] creditor is not permitted to setoff the debtor's prepetition obligation to him against his obligation to the debtor which arose postpetition, because the two obligations lack mutuality." *In re Mohawk Indus.*, 82 B.R. at 176. The purpose of section 348(d), as with "any bankruptcy law is to provide a discharge of debts in order to grant the debtor a fresh start. To permit the set off of prepetition debts owed by the debtor against independent postpetition debts owed to the debtor would be a complete frustration of any fresh start." *Id.* at 177. Here, however, enforcement of section 348(d) would not further its underlying purpose of providing the debtor with funds for a fresh start or for reorganization; it would merely provide Zions with a priority to which it is not entitled under state law.

Moreover, the decision upon which Zions relies is of doubtful authority in any event. Zions points to the case of *Still v. United Pipe & Supply Co. (In re W.L. Jackson Mfg. Co.),* 50 B.R. 498 (Bankr.E.D.Tenn.1985). There the court applied section 348(d) to prevent a setoff, although in so doing the court "realize[d] that this result could affect the rehabilitation of debtors under Chapter 11" by discouraging potential creditors from dealing with a Chapter 11 trustee or debtor in possession. *Id.* at 504–05. In a subsequent case, the same court refused to apply section 348(d), pointing out that "the law as set out in § 348 is far from clear as to how postbankruptcy debts are to be treated when a Chapter 11 case converts to Chapter 7 after partial performance of a confirmed plan." *Paris v. Transamerica Ins. Group (In re Buckley & Assocs. Ins., Inc.),* 67 B.R. 331, 335 (Bankr.E.D.Tenn.1986). The court believed that in refusing to apply section 348(d) it "reached a result that is not only legally correct but is just as to [the creditor seeking setoff] and the debtor's other creditors." *Id.* at 335. Upon appeal of this decision, the district court reached a different outcome but likewise refused to apply section 348(d), holding that "the appropriate analogy is to cases involving set-off during a Chapter 11, ignoring the conversion to Chapter 7 in

this case." *Paris v. Transamerica Ins. Group (In re Buckley & Assocs. Ins., Inc.),* 78 B.R. 155, 158 (E.D.Tenn.1987). The court further observed that "[s]et-off is permissible in Chapter 11 ... where it does not undermine the debtor's ability to reorganize," and that "[t]he decision to grant or deny set-off is also guided by equity." *Id.*

■ Finally, we consider Zions' policy argument. Zions has argued throughout these proceedings that unless it prevails, "lenders simply will not provide post-petition financing to Chapter 11 debtors, and the underlying policy of Chapter 11 to help failing businesses rehabilitate themselves will be frustrated." Br. of Aplee. at 10. In so doing, Zions simply fails to acknowledge the critical fact that commercial lenders such as Zions have a readily available means of protecting their security interest in the accounts receivable of a Chapter 11 debtor against the claim of a party such as Christiansen. They need only give notice under U.C.C. section 9–318 in one of two ways. *See 4447 Assocs.,* 889 P.2d at 472 & n. 8; *see also id.* at 470 n. 5. Mere notice of the assignment under section 9–318(1)(b) would have cut off Christiansen's ability to setoff its claim against amounts due Davidson, while notice and demand for payment under section 9–318(3) would have required Christiansen to pay the amounts due Davidson directly to Zions. Zions could thus have given notice under section 9–318(1)(b) so as to obtain protection against setoff without impeding Davidson's ability to reorganize by requiring Christiansen to pay the funds to Zions rather than Davidson.

Although Zions is harshly critical of Christiansen's alleged failure to take action to protect itself, in our view the magnitude of Zions' failure leaves it in no position to point the finger of blame elsewhere. Zions, as a sophisticated commercial lender extending post-petition financing to a debtor in possession, failed to act in a commercially prudent manner when it did not avail itself of the protection provided under state law. We do not believe the result we reach here will affect the availability of post-petition financing generally because we are convinced that commercial lenders as a rule do not overlook the state law protection that Zions failed to use in this case.

Accordingly, we REVERSE and REMAND with directions to enter judgment in favor of Christiansen.

SAFFELS, Senior District Judge, Dissenting.

Because I find the district court's reasoning persuasive and its result correct, I cannot support the majority's decision to reverse. I, therefore, dissent.

The facts have been well-stated and will not be repeated here. Suffice it to say that the crux of the matter is whether Christiansen, the general contractor, had the right under Utah law to pay Diehl, the lien claimant, the amount claiming to be owed to release the lien, and by doing so create a defense to Christiansen's obligation to pay Davidson, the bankrupt subcontractor.

The district court found that under Utah law Christiansen had no legal duty to the supplier, Diehl, and had no legal right to pay Diehl directly. The court further found that such payment did not release Christiansen from its obligation to pay Davidson.

Diehl, of course, had every right to protect itself by filing a mechanic's lien against the project owner. The mere filing of this lien in no way legally obligated Christiansen. Christiansen's decision to bypass payment to Davidson and pay Diehl was merely to protect itself from the project owner with whom Christiansen had contracted to deliver a lien-free project.

As the district court noted:

the mechanic's lien statute is to protect those who have added directly to the value of real property by performing labor or furnishing material. This statute was intended and designed to prevent the owner of land from taking benefit of improvements placed on his property without paying for the labor or material that went into them. *In Re Davidson Lumber Sales, Inc.,* 167 [164] B.R. 773, 776 (D.Utah, C.D. 1993).

The statute applies to the owner because it is the owner's real property to which the lien attaches. Nothing in the statute indicates it

applies to the general contractor in the same way. *Id.* The project owner wisely had protected itself through the contract with Christiansen. Christiansen, once Diehl filed the lien, faced the dilemma of whether to: (1) satisfy its contractual obligation to the project owner by paying Diehl to insure the release of the lien; (2) pay Davidson and satisfy that contractual obligation; or (3) pay both Diehl and Davidson at a substantial monetary loss. Christiansen chose option 2 and thereby fulfilled its contractual obligation to the project owner.

The district court provided a succinct and accurate synopsis of the protective actions of the parties in this matter:

> Christiansen voluntarily contracted with the owner to keep the property clear of any mechanic's lien and Christiansen could have imposed the obligation on Davidson, but it did not. Diehl protected itself by filing a mechanic's lien; Zions protected itself with its super-priority post-petition lien on Davidson's inventory and accounts receivable; and the owner protected itself with its contract with Christiansen.

*Davidson,* 164 B.R. at 778.

It is clear to me that all parties except Christiansen protected their interests in this project. Christiansen, presumably a seasoned general contractor, failed to adequately protect its interests when it could easily have done so. It should not now be rewarded and allowed to breach its contractual obligations to Davidson. The result of such an action is that Zions, a party which did protect itself, suffers a unjustifiable loss.

The district court correctly concluded that there was nothing under Utah law which gave Christiansen the right to pay Diehl and not pay Davidson as required under the contract.

Because I would affirm the district court's decision, I, respectfully, dissent.