790 F.2d 1121
 1 UCC Rep.Serv.2d 898
 MID-ATLANTIC SUPPLY, INC. OF VIRGINIA and Jack D. Maness,
Trustee, Plaintiffs,
and
United Virginia Bank, Appellant,
v.
THREE RIVERS ALUMINUM COMPANY, Appellee.
In re MID ATLANTIC SUPPLY COMPANY, Debtor.
 No. 85-1795.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 8, 1986.
Decided May 21, 1986.
 
 Richard T. Robol (Seawell, Dalton, Hughes & Timms, Norfolk, Va., on brief), for appellant.
 Charles M. Lollar (Willcox, Savage, Dickson, Hollis & Eley, P.C., Norfolk, Va., on brief), for appellee.
 Before RUSSELL and WIDENER, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 The appellee herein, Three Rivers Aluminum Company (TRACO), moved the bankruptcy court having jurisdiction of the Chapter 11 proceeding of the debtor Mid-Atlantic Supply, Inc. of Virginia (Mid-Atlantic) for the entry of an order modifying the automatic stay provided by Sec. 362(a) of the Bankruptcy Code to permit delivery to TRACO by the debtor in possession of a check drawn by the R.A. Lawson Corporation (Lawson) and payable jointly to TRACO and Mid-Atlantic in the amount of $109,000. The bankruptcy judge granted the motion, finding that "the Debtor and TRACO entered into a three-way agreement whereby the Check was drawn by Lawson, payable jointly to the Debtor and TRACO, and delivered to the Debtor, in trust for the benefit of TRACO and that TRACO was entitled to receive and retain the Check pursuant to such arrangement...." The trustee appealed that decision to the district court. In the meantime Mid-Atlantic's original Chapter 11 proceeding had been converted into a Chapter 7 proceeding. The trustee in the Chapter 7 proceeding abandoned any claim to the check and TRACO filed anew a motion under Rule 70, Fed.R.Civ.P., for possession of the check. At this point, the United Virginia Bank (Bank), which claimed a prior perfected security interest in all accounts receivable of Mid-Atlantic, moved to intervene in order both to protect its security interest and to contest on behalf of the estate the propriety of the bankruptcy judge's turn-over order. The district court granted the Bank's motion to intervene but, after a hearing, it granted TRACO's Rule 70 motion, holding "that the Trustee and the bankruptcy estate of Mid-Atlantic are divested of title and possession of the check in the amount of $109,000.00, payable jointly to Mid-Atlantic and TRACO, and said title and possession is vested in TRACO." It refused to disturb the trustee's abandonment of a claim to the check. It did not discuss the Bank's argument of the applicability of the Virginia Commercial Code, though it is to be assumed the court found the contention without merit. The Bank has appealed that order of the district court. We affirm in part and reverse in part.
 
 
 2
 The controversy involved in this appeal arose out of an agreement between Lawson, the primary contractor, and Mid-Atlantic, whereby the latter was to install customized aluminum windows at what was known as the Freemason Condominium Project in Norfolk, Virginia. The agreement appears to have contemplated two distinct performances: one involved the supplying of the customized windows, the approved model for which was to follow a design to be developed by TRACO; the other involved the actual installation of the windows fabricated by TRACO. Moreover, the two parts, according to the undisputed testimony, were to be "handled" differently: the acquisition of the windows "was [to be] handled on a purchase order"; the installation work "was [to be] handled on a subcontract." Immediately after Lawson and Mid-Atlantic had gotten together on this arrangement, however, a problem arose. Because of its credit investigation of Mid-Atlantic, TRACO would accept an order from Mid-Atlantic for the windows only on a cash basis. Until TRACO accepted the order and began the manufacture of the windows, no progress could be made. Finally, TRACO said it would accept the order and begin work on the windows but only on one of three arrangements: one would require a cash deposit of 50 per cent of the price for the windows to be made at the time of the acceptance of the order with the remainder of the purchase price to be paid on delivery or COD; a second would be "a standby irrevocable letter of credit in the amount of the contract" from an acceptable bank; and the third would be "to arrange for a joint check arrangement through a suitable creditor on the project [obviously, the primary contractor, Lawson]," an arrangement which would assure that "the monies would come through a joint check arrangement and would be within the control of TRACO." Mid-Atlantic expressed the desire to proceed under the last plan. However, TRACO was still unwilling to go forward until Lawson itself had agreed to be bound by the arrangement in writing. TRACO had, in the meantime, obtained a credit report on Lawson and had concluded, according to its credit officer, that Lawson, unlike Mid-Atlantic, was "well acceptable within our normal [credit] confines and we would accept [credit] on Lawson Company." Lawson signed the required letter and TRACO then commenced work on the order.
 
 
 3
 TRACO delivered to the site the windows purchased and Mid-Atlantic proceeded to install the windows per its subcontract. On November 12, 1984, Lawson issued its check which is the subject of this controversy. This check was in payment for the windows and was issued payable jointly to Mid-Atlantic and TRACO. At the same time, Lawson issued a separate check, payable solely to Mid-Atlantic, in payment of the agreed contract price under Mid-Atlantic's subcontract for installing the windows. When the joint check was received by Mid-Atlantic, the president of Mid-Atlantic stated it was his intention to "[s]ign it, send it to Three Rivers [i.e., TRACO], and that way ... have the account balance." In response to the inquiry whether he intended to do this because he considered "[t]he money [more accurately the check] was never yours, was it?", the president of Mid-Atlantic testified: "I didn't think it was then." On the same day it received the check Mid-Atlantic filed its Chapter 11 petition. Accordingly, the check was still in Mid-Atlantic's possession at the time the bankruptcy action was begun. It is the title and right of possession to that check which is the issue in this appeal.
 
 
 4
 It is the position of TRACO, accepted by both the bankruptcy judge and, on appeal, by the district judge, that Mid-Atlantic held the check "in trust" for TRACO, which as the beneficiary of the trust was entitled to possession and title thereto. The Bank, on the other hand, argues that the check and its proceeds were to be treated as an asset of the bankruptcy estate, title to which was vested in the debtor Mid-Atlantic. In support of its position, the Bank relies first on Sec. 541(a) of the Bankruptcy Reform Act of 1978, under which, under its construction of the Section, the check became "property" of the debtor subject to administration and disposition as property owned by the debtor. The Bank also argues that the transaction involving TRACO, Mid-Atlantic, and Lawson resulted in TRACO holding a security interest in the check which secured payment of Mid-Atlantic's indebtedness to TRACO. The Bank then urges that its prior perfected security interest in Mid-Atlantic's accounts receivable had priority under the Virginia Commercial Code and entitled it to ownership of the check. We begin with an inquiry into the scope of Sec. 541(a).
 
 
 5
 The Bank seems to agree that prior to The Bankruptcy Reform Act of 1978 with its addition of Section 541(a), the check, if held by the debtor in trust at the time of the bankruptcy filing would not have been treated as an asset of the bankruptcy estate but as the property of the beneficiary of the trust. Thus, in its brief in this court, it said that "[u]nder the bankruptcy acts which preceded the Bankruptcy Reform Act, property held by the bankrupt in trust thus belonged to the beneficiary and never became a part of the bankruptcy estate under former Sec. 70." But the Bank posits that this rule was changed by the revised Sec. 541(a) and argues that under the enlarged definition of "property" of the bankrupt contained in Sec. 541(a) Lawson's check in possession of the debtor at the filing of the bankruptcy proceedings is to be regarded properly as "property" of the debtor, subject to administration and distribution in such proceedings as a part of the assets of the bankruptcy estate. There is no dispute that, as the Bank argues, Sec. 541(a) broadened the definition of bankruptcy "property" beyond what it had been earlier under the Act. We recognized this change in our opinion in Tignor v. Parkinson, 729 F.2d 977, 980 (4th Cir.1984). But neither the language of Sec. 541, taken as a whole, nor its legislative history supports the Bank's construction of the Section as changing the prior rule as to property held by the debtor in trust or as destroying the rights of beneficiaries in property held in trust by the debtor at the commencement of the bankruptcy proceeding. The bankruptcy estate is said in 541(a)(1) to consist of "all legal or equitable interests of the debtor in property as of the commencement of the case." But subsequently in 541(d) the statute makes quite clear that this language of (a) does not include property that the debtor does not hold in his own right. To make this intention doubly certain, Sec. 541(d) provides that "[p]roperty in which the debtor holds ... only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." Further, the Senate Report, in explaining the scope of the Section, declared that under Sec. 541 the trustee "could take no greater rights than the debtor himself had." S.Rep. No. 989, 95th Cong., 2d Sess. 82, reprinted in 1978 U.S.Code Cong. & Ad.News, 5787, 5868. The Report proceeded to declare that this limitation upon the rights of the trustee applied particularly to property held in trust. It said:
 
 
 6
 Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed. This section and proposed 11 U.S.C. 545 also will not affect various statutory provisions that give a creditor of the debtor a lien that is valid outside as well as inside bankruptcy, or that creates a trust fund for the benefit of a creditor of the debtor. See Packers and Stockyards Act Sec. 206, 7 U.S.C. 196. Id.
 
 
 7
 Moreover, from the outset Sec. 541 has been authoritatively construed in conformity with this legislative history. In Selby v. Ford Motor Co., 590 F.2d 642, 648-49 (6th Cir.1979), a case that arose under the Bankruptcy Act prior to the 1978 Amendments, the court drew upon its construction of the new Sec. 541 to support its decision under the earlier Act. In that case, the court, in construing Sec. 541, said:
 
 
 8
 The new Act, signed by the President on November 6, 1978, expressly recognizes trust interests created under state law. Section 541, the "property" section of the new law, provides that the bankruptcy estate shall include "all legal and equitable interests of the debtor in property." But it limits the interests of the trustee in bankruptcy to the debtor's interest in the trust. 590 F.2d at 648.
 
 
 9
 Shortly thereafter, the court in Matter of Kennedy & Cohen, Inc., 612 F.2d 963, 966 (5th Cir.), cert. denied, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980), summarized its construction of the Section as follows:
 
 
 10
 The court agrees with appellant that constructive trusts recognized by state law may be imposed against specified assets in appropriate circumstances, and those assets do not become part of the bankrupt's estate.
 
 
 11
 The decisions applying Sec. 541 in connection with trusts, whether express, statutory or equitable constructive trusts, have uniformly followed this construction of Sec. 541, as set forth in Selby and Kennedy & Cohen, in their application of the Section to trust property. The practical result of such an application has been clearly stated in In re Butts, 46 B.R. 292, 295 (D.N.D.1985):
 
 
 12
 Where constructive trusts have been found to exist, courts have held the result to be analogous to an express trust in that a bifurcation of title occurs. Legal title remains with the party in possession of the property while equitable title vests with the person claiming as beneficiary. (Citing cases) When a debtor holds only bare legal title as a consequence of imposition of a constructive trust, then it is only that bare title which becomes property of the estate under section 541. (Citing cases) Legal title alone has been held to be of no value to the estate and the debtor will be required to reconvey the property or its substitute to the beneficial owner.
 
 
 13
 This language is a restatement of the phrasing of the rule in In re Flight Transportation Corp. Securities Litigation, 730 F.2d 1128, 1136 (8th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985):
 
 
 14
 [W]here, under state law, the debtor's fraud or other wrongful conduct gives rise to a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to reconvey it to the rightful owner, the estate will generally hold the property subject to the same restrictions.
 
 
 15
 And, as the court in In re American International Airways, Inc., 44 B.R. 143, 146 (Bankr.E.D.Pa.1984) pointed out, this application of the Section was recognized and accepted in Georgia Pacific Corp. v. Sigma Service Corp., 712 F.2d 962, 967, n. 4 (5th Cir.1983), a case which, like the case under review, involved conflicting claims between the debtor in possession claiming ownership of a joint check and a materialman asserting a trust over the check. The court, although finding that no constructive trust under the facts of that case had been established, said:[I]f indeed all or part of the money so owed was subject to a constructive trust in favor of the suppliers ... the bankruptcy court would be required to recognize those equitable interests and, perhaps, the debtor in possession's sole permissible administrative act with regard thereto would be to pay over or endorse the sums due to the beneficial owners of the property. 712 F.2d at 968.
 
 
 16
 This reasoning in Sigma has been followed consistently in recent cases which have dealt concretely with the respective rights of a debtor in possession or its trustee and the beneficiary of a constructive trust; i.e., that if a trust, whether express, statutory or constructive, is established over property in the possession of the trustee or debtor in possession, the "sole permissible administrative act" of the trustee or debtor in possession is to pay over or endorse over the property to the beneficiary or beneficiaries of the trust. See In re STN Enterprises, Inc., 47 B.R. 315, 318 (Bankr.D.Vt.1985); In re Butts, supra; In re American International Airways, Inc., supra; In re Martin Fein & Co., Inc., 43 B.R. 623, 626 (Bankr.S.D.N.Y.1984); Reliance Insurance Co. v. Brown, 40 B.R. 214 (W.D.Mo.1984); Beneficial Finance Co. of Va. v. Franklin, 26 B.R. 636, 638 (W.D.Va.), vacated and remanded, 714 F.2d 127 (4th Cir.1983).
 
 
 17
 It follows that the critical issue in this case is whether the check in question was impressed with a constructive trust in favor of TRACO, an issue resolvable under state law. American International Airways, Inc., supra, at 146; In re Minton, 28 B.R. 774, 783 (Bankr.S.D.N.Y.1983). If it was so held, it is manifest that equitable title to the check is in TRACO which is entitled to title and possession as the district court held.
 
 
 18
 The circumstances under which a trust may be created under Virginia law are set forth authoritatively in Broaddus v. Gresham, 181 Va. 725, 26 S.E.2d 33, 35 (1943), which states that, "[a]ny words 'which unequivocally show an intention that the legal estate was vested in one person, to be held in some manner or for some purpose on behalf of another, if certain as to all other requisites, are sufficient' to create a trust." And, if the party receiving the funds or property under such circumstances does not deliver over the funds or property, "the beneficiary can maintain an action at law against the trustee to enforce payment" or delivery of the res. 26 S.E.2d at 36. In Schloss v. Powell, 93 F.2d 518 (4th Cir.1938), a case which arose in Virginia, we expressed much the same rule on the creation of a trust. We said:
 
 
 19
 There is no doubt that money can be placed in the hands of one person for payment to another under such circumstances that a trust arises in favor of the latter which he may enforce; and this end may be accomplished by an express declaration of trust or by circumstances indicating an intention of the depositor to place the fund irrevocably beyond his control and to devote it to the indicated purpose.... 93 F.2d at 519.
 
 
 20
 The evidence in this case seems undisputed that TRACO refused to sell the materials to Mid-Atlantic on any basis other than a C.O.D. basis and, even then, it would require payment of 50 per cent of the purchase price on the acceptance of the order. TRACO finally agreed, however, to furnish the windows if Lawson, the general contractor whose credit was found acceptable by TRACO, would agree in writing to pay for the windows on delivery by a check payable jointly to Mid-Atlantic and TRACO. That check issued in payment for the windows was to include no payment to be made to Mid-Atlantic for its work under the latter's installation subcontract with Mid-Atlantic. It was to cover only the purchase from TRACO of the windows. Mid-Atlantic understood perfectly it had no interest in the check issued by Lawson in payment for the windows. Mid-Atlantic's president explained in his testimony that Mid-Atlantic's connection with the check in payment for the windows was that of, as it were, a mere conduit between Lawson and TRACO. Its function in the transaction was solely to indorse the joint check and pass it on to TRACO as TRACO's property. Mr. Jackson, Mid-Atlantic's president, explained that this was the procedure to be followed because the check was not Mid-Atlantic's. To summarize: this transaction was a sale of windows made by TRACO entirely on the credit of Lawson, for which Lawson was to pay with the clear understanding of all the parties that such payment itself was to be received solely by TRACO. Admittedly Mid-Atlantic, under this arrangement had not the slightest interest in the check. The check in this case, though made payable jointly to Mid-Atlantic and TRACO, was thus intended as a payment to TRACO by Lawson for the windows, much the same as the situation hypothesized by the court in Keenan Pipe & Supply Co. v. Shields, 241 F.2d 486, 491 (9th Cir.1956) was. The district court correctly found on these facts that there was a constructive trust in favor of TRACO under the law of Virginia, that equitable title and right of possession in the check and its proceeds (subject to the exception later noted) belonged to TRACO, and that there was accordingly a constructive trust in favor of TRACO in the check and its proceeds (subject to the exception later noted.)
 
 
 21
 The Bank appears to argue that Sigma, construing Mississippi and Arkansas law, found that a joint check arrangement such as that here was insufficient to establish a constructive trust in favor of a supplier under a construction contract. Sigma, however, was entirely different on its facts from the case we have under review and the grounds of the decision therein are inapplicable here. The issue of a constructive trust arising out of the joint check arrangement in that case was submitted to the court of appeals without incorporating in the record "the transcript of evidence," 712 F.2d at 971, and the parties relied solely on the documentary evidence in contesting the appeal. The court said there was an "absence of any evidence that actions in reliance or other consideration made [the joint check] agreement binding." Id. So far as the record showed, the arrangement represented "merely Sigma's unilateral agreement," under which it was "neither required to endorse the checks nor to transfer [the checks] immediately to the suppliers, nor [was] Sigma prohibited under the terms of the agreement from revoking its 'plan' as 'propose[d]' by the letter" and actually Sigma "had revoked the authority to make co-payment for funds due to it prior to negotiation and payment of any checks previously issued." Id. at 971-72. Manifestly that is not this case. This arrangement was not a "mere unilateral agreement" by Mid-Atlantic; it was a valid, binding agreement, which both Mid-Atlantic and Lawson were estopped to revoke. TRACO refused even to prepare shop drawings preparatory to fabricating the windows until both Mid-Atlantic and Lawson had committed themselves to observing the agreement. Both Mid-Atlantic and Lawson were clearly estopped from revoking the agreement by this reliance of TRACO on the agreement in fabricating and delivering the material. This is a significant difference between this case and Sigma. Had there been in Sigma the same "reliance" by the supplier as in this case, the plain inference of the court in Sigma is that the result would have been different. Actually, then, Sigma, properly analyzed supports the decision below on the materials supplied to the Freemason Project.
 
 
 22
 The Bank also argues that the Uniform Commercial Code as adopted by Virginia subordinates TRACO's rights to its perfected security claim. Title 9 of the Uniform Commercial Code, however, "only covers transactions 'intended to create a security interest in personal property.' " Va.Code Sec. 8.9-102 Virginia Comments at 412 (1965). It abandoned the "traditional formal distinctions among security devices" and followed the rule of looking beyond form or even wording to the substance of the transaction in determining whether there was this essential intention. Matter of Miller, 545 F.2d 916, 918 (5th Cir.), cert. denied, 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977); see also Rushton v. Shea, 419 F.Supp. 1349, 1365 (D.Del.1976); In re Tulsa Port Warehouse Co., Inc., 690 F.2d 809, 811 (10th Cir.1982). Lyon v. Ty-Wood Corp., 212 Pa.Super. 69, 239 A.2d 819 (1968), a case cited with approval in the Official Comments to Sec. 8.9-104 in the 1985 Supplement to the Virginia Code, is illustrative of this principle. In that case a party was assigned sums due it under a contract with a third party. There was some testimony that the assignments "were taken as 'security' for loans" made previously to the assignor by the assignee. Id. at 821. However, the court found, after reviewing all the circumstances of the assignments, "that the parties to the assignments intended ... an assignment, absolute and unqualified, of the assignor's right to receive certain moneys from the named corporations to the assignee, in payment of the assignor's debt to the assignee." Id. In reaching this conclusion that the transaction was not within the definition of "security" or "security interest," the court states as its "considered judgment" that
 
 
 23
 The words "secured" and "security" appearing in the record of testimony elicited from Thomas Scott, and the inferences therefrom, must fall before the weightier evidence consisting of the absolute and unqualified language of the assignments and the other evidence in the record that is consistent with the conclusion that the assignments were given in payment and not for security. In effect, we conclude that Thomas Scott's use of the word "security" was in the general sense of indicating that he [viewed] the assignments as assuring him of the moneys owed him by Ty-Wood because it entitled him to receive the moneys directly from his debtor's presumably more financially responsible obligor. Id. (quoting the trial court opinion in the same case).
 
 
 24
 A similar conclusion is in order here. We shall not review in detail again the facts warranting the finding that the check in question was in fact the property of TRACO and that Mid-Atlantic's possession was "in trust." Those same facts are pertinent in resolving whether the Commercial Code is applicable in this case. In effect, TRACO was only induced to manufacture and furnish the windows required for the Freemason project after Lawson was brought into the picture. TRACO had investigated the credit responsibility of Lawson and found the latter credit worthy. It was solely on the basis of Lawson's agreement that the latter would issue a check in payment for the windows payable jointly to TRACO and Mid-Atlantic that TRACO undertook the manufacture and made delivery of the windows. This arrangement, in the opinion of TRACO, ensured that it would receive payment--payment from Lawson--for the windows. Just as in Ty-Wood, there were some loose expressions about "ensuring payment," etc. in the discussions but none of these expressions alters the real substance of the transactions. This was in fact and substance a sale made by TRACO on the credit of Lawson to be paid for by Lawson, and actually paid for by this check of Lawson. Mid-Atlantic never had any interest in the sale except that it was necessary that the windows be furnished the project so that it could earn its fee under its subcontract to install them. It recognized this and its president disclaimed any interest in the check, which, as he described it, wasn't "his." There was accordingly no security interest in this case and the Uniform Commercial Code was not implicated in the transaction.
 
 
 25
 There was one final problem posed by the case. Included in the check in question is payment for materials furnished by TRACO on a project other than the Freemason project, to wit, the Fort Magruder job in Williamsburg, Virginia. Lawson had no connection with the Fort Magruder project; the contractor on that project was the Jordan Company. Rieger, the credit manager of TRACO, testified to a conversation with someone at Mid-Atlantic before accepting this order. He said he refused to sell to Mid-Atlantic other than on the same basis as he had agreed to sell material for the Freemason Project. Jackson, representing Mid-Atlantic, responded that this arrangement was not possible in connection with the Fort Magruder job because Jackson "didn't have the same rapport with the Jordan Company that he had with Lawson." He suggested as an alternative the inclusion of the invoicing of the Fort Magruder Project along with the Freemason project into a single invoice to Lawson "which [would be] well within the limits of the purchase order which [Mid-Atlantic] could invoice for, which would enable [it] to get a single check drawn on Lawson that I [would be] able to pass on to TRACO that would pay them in full." That procedure was followed. Accordingly, the check in controversy covered payment of $17,000 which was incurred in connection with the Fort Magruder job.
 
 
 26
 We are unable to find that the trust which the parties created to cover the purchases on the Freemason Project covered similarly the Fort Magruder project, especially since Jackson, who represented Mid-Atlantic in these transactions testified that there were no arrangements connected with the Fort Magruder job and, as he understood it, the material for that job "was shipped on open credit."
 
 
 27
 We accordingly affirm the decision of the district court to the extent that the check issued by Lawson covered materials furnished Lawson on the Freemason Project under the three-party agreement already detailed but reverse and remand for further proceedings the disposition of so much of the proceeds of the check as relates to the Fort Magruder Project.
 
 
 28
 AFFIRMED IN PART, REVERSED IN PART, REMANDED IN PART.