### In re RAILWORKS CORPORATION, et al., Debtors.

### Zvi Guttman, Litigation Trustee, Plaintiff,

### v.

### Impulse NC, Inc., Defendant.

**Bankruptcy Nos. 01–64463–JS to 01–64485–JS. Adversary No. 03–5367.**

United States Bankruptcy Court, D. Maryland.

March 14, 2008.

---

Diarmuid F. Gorham, Paul V. Danielson, Richard Marc Goldberg, Shapiro Sher Guinot & Sandler, Baltimore, MD, for Plaintiff.

Richard L. Costella, Patricia A. Borenstein, Miles & Stockbridge P.C., Baltimore, MD, Michelle G. Novick, Christine M. Berish, Gary E. Green, FagelHaber LLC, Chicago, IL, for IMPulse NC, Inc.

### *MEMORANDUM OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [P. 35] AND DISMISSING COMPLAINT TO AVOID AND RECOVER PREFERENTIAL TRANSFERS*

JAMES F. SCHNEIDER, Bankruptcy Judge.

Before the Court is the defendant's motion for summary judgment filed against

the complaint to recover alleged preferential transfers brought by the litigation trustee pursuant to the Chapter 11 debtors' confirmed plan of reorganization.[1] For the reasons set forth, the motion for summary judgment will be granted and the complaint will be dismissed.

### FINDINGS OF FACT

1. On September 20, 2001, Railworks Corporation ("Railworks") and 22 of its affiliates filed petitions for bankruptcy under Chapter 11 (Case Nos. 01–64463 to 01–64485, jointly administered under Case No. 01–64463). One of Railworks' affiliates was L.K. Comstack & Company, Inc. ("debtor" or "Comstack"), Case No. 01–66473.

2. Comstack was a subcontractor, the duties of which involved constructing a portion of the traction electrification system for the Dallas Area Regional Transit Authority ("DART"). In March 1999, DART hired Powell Power Electronics Company, Inc. ("Powell") as a general contractor, and in May 1999, Powell in turned contracted with Comstack as a subcontractor. Defendant's Exhibits A and D.

3. The subcontract provided that "[t]his subcontract shall be governed by the laws of the State of Texas." Defendant's Exhibit D.

4. In July 1999, Comstack, in turn, entered into a sub-subcontract with WABCO Passenger Transit Division ("WABCO"), pursuant to which WABCO agreed to construct, manufacture and deliver overhead components for the traction electrification system in exchange for $2.5 million, payable in installments. Defendant's Exhibit E. Under the sub-subcontract, WABCO agreed to be bound on the same terms as the debtor was bound to Powell and as

Powell was bound to DART. Sub-subcontract, Exhibit E to IMPulse's Motion for Summary Judgment, Exhibit B therein.

5. In February 2000, IMPulse NC, Inc. ("IMPulse") acquired the overhead hardware line from WABCO and assumed its obligations under the sub-subcontract. Defendant's Memorandum at p. 3.

6. According to Powell's contract with DART (the "General Contract"), Powell was required to pay all subcontractors and materialmen that provided labor and/or materials on the DART project. General Contract, Exhibit A to IMPulse's Motion for Summary Judgment, § 42 of Exhibit E therein. The General Contract also required Powell to obtain a performance bond to guarantee payment to those two groups. General Contract, Exhibit A to IMPulse's Motion for Summary Judgment, § 2 of Exhibit E therein. Accordingly, in March 1999, Powell obtained a performance bond from Liberty Mutual Insurance Company ("Liberty Mutual"). Defendant's Exhibit B. To the extent that Liberty Mutual was required to pay any claims, Powell agreed to indemnify Liberty Mutual. Defendant's Exhibit C.

7. At some point in mid–2001, IMPulse began to take affirmative steps to adjust to the debtor's worsening financial circumstances. Accordingly, the debtor, IMPulse and Powell entered into an agreement whereby at the time the debtor submitted its invoices to Powell, Powell agreed to issue one check payable solely to the debtor, and another check payable jointly to the debtor and IMPulse, in the amount that the debtor owed IMPulse. Defendant's Memorandum, ¶¶ 3 and 4; Leutwyler Aff. at ¶ 13; Wharton Aff. at ¶ 7.

---

1. This Court has jurisdiction over the instant complaint pursuant to 28 U.S.C. § 1334. This is core proceeding under 28 U.S.C. § 157(B)(2)(f). Venue is proper in this district under 28 U.S.C. § 1409.

8. Pursuant to this agreement, IMPulse received three checks made payable to the debtor and IMPulse jointly, drawn on Powell's accounts, for work on the DART project: one dated June 22, 2001 in the amount of $379,365.59, the second dated August 6, 2001, in the amount of $109,065.87, and the third dated August 8, 2001 in the amount of $480,882.20 (collectively, the "Joint Checks."). Defendant's Exhibit F.

9. On September 20, 2001, the debtor filed bankruptcy.

10. On February 5, 2002, the debtor filed a motion to assume the contract with Powell [P. 534], and proposed to pay cure amounts to sub-subcontractors, including IMPulse. Specifically, it proposed to pay IMPulse the sum of $381,007.77. The motion was served on a number of parties, including the Official Committee of Unsecured Creditors.

11. On February 22, 2002, IMPulse filed an objection to the motion [P. 593], in which it disputed the cure amount, and claimed to be owed $918,909.75. IMPulse also claimed that the debtor had ordered postpetition services from it which were entitled to administrative claim status.

12. On March 8, 2002, IMPulse filed Claim No. 3113 in the amount of $1,608,506.22.

13. While its objection to the motion to assume the contract was pending, IMPulse continued to perform work on the DART project. IMPulse and the debtor negotiated the appropriate cure amount, as well as certain warranty concerns related to IMPulse's materials. These discussions were on-going at various points in February, June and August 2002.

14. On October 1, 2002, this Court (Derby, J.) confirmed the debtors' "Modified Second Amended Joint Chapter 11 Plan of Reorganization" ("The Plan") [P.1274].

15. The Plan created two separate entities, namely, the Reorganized Debtor and a Litigation Trust. Plan, §§ 5.15 and 5.25. Zvi Guttman was appointed Litigation Trustee. While most of the assets of the estate were transferred to the Reorganized Debtor, the Plan transferred so-called "Litigation Trust Claims" to the Litigation Trust. *Id.* Section I.A.1.88 of the Plan defined "Litigation Trust Claims" as follows:

> (i) Reserved Causes of Action, (ii) Legacy Claims, and (iii) claims for the avoidance of any transfer by or obligation of the Estates or the Debtors under chapter 5 of the Bankruptcy Code or the recovery of the value of such transfer; *provided, however,* that no such claim shall exist against a Creditor whose claim was paid pursuant to orders authorizing the assumption of executory contracts or unexpired leases and orders authorizing the payment of certain prepetition obligations to critical vendors and service providers.

*Id.*

16. Pursuant to the Plan, the Reorganized Debtors and the Litigation Trustee entered into a "Litigation Trust Agreement," which provided as follows:

> ... each Railworks grantor has executed this Agreement and absolutely and irrevocably grants, assigns, transfers, conveys and delivers to the Litigation Trustee, on behalf, and for the benefit, of the Beneficiaries on the terms provided herein, all of its respective right, title and interest in the Litigation Trust Claims free and clear of all liens, claims and encumbrances ... provided, further, that the Litigation Trustee shall receive 100% of the legal title to the Litigation Trust Claims....

Litigation Trust Agreement, Declaration of Litigation Trust at 3.

17. On December 20, 2002, the debtor and IMPulse entered into a Settlement and Release Agreement ("The Release Agreement") and submitted a consent order for the Court's approval. Defendant's Exhibit I. Upon the debtor's payment of $658,000 to IMPulse, the Release Agreement purported to "settle and compromise all disputes between IMP & LKC [L.K. Comstack & Company, Inc.] regarding ..." the DART project. Defendant's Exhibit I. The Release Agreement continued:

> Clearing of the aforementioned payment by IMP's bank and receipt of the aforementioned bond shall fully and unconditionally release each party from all causes of action, suits, demands, prior agreements, claims and judgments that LKC and IMP now have or ever had in relation to the subject project. Furthermore, LKC and IMP shall not bring any suit, claim or other manner of action for moneys or liability due that are not contained in this agreement.

Defendant's Exhibit I.

18. The Litigation Trustee did not receive notice of the settlement. The Release Agreement was not served on him, nor was he included in any of the negotiations. The Release Agreement was approved by order of court dated February 27, 2003 [P.1458].

19. On September 16, 2003, the Litigation Trustee filed the instant adversary proceeding against IMPulse, by which he sought to recover the amount of the Joint Checks issued by Powell as preferential transfers pursuant to 11 U.S.C. § 547.[2]

20. On May 4, 2006, IMPulse filed the instant motion for summary judgment [P. 35], to which it attached affidavits from Emil Leutwyler [Exhibit No. 17], a project manager at a successor company to Powell, and from Jeffrey Wharton, an executive vice-president of IMPulse [Exhibit No. 18].

21. On July 31, 2006, the Litigation Trustee filed a motion to strike the affidavits [P.40], and attached his own affidavit [Exhibit No. 2]. He filed simultaneously an opposition [P. 41] to the defendant's motion for summary judgment. On August 17, 2006, IMPulse filed its response [P. 51] to the Litigation Trustee's opposition, as well as a motion to strike the Litigation Trustee's affidavit [P.53].

### CONTENTIONS OF THE PARTIES

IMPulse argued that there are four independent grounds on which this Court could grant summary judgment: First, that the Plan did not authorize the Litigation Trustee to pursue this cause of action because the contract has been assumed. Second, that the cause of action is barred by the Release Agreement. Third, that the Joint Checks were not transfers of

---

**2.** At the time this case was filed, 11 U.S.C. § 547(b) provided as follows:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an *interest of the debtor in property*—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

*Id.* (Emphasis added).

"property of the estate," as required by 11 U.S.C. § 547(b), because they were simply pass-through payments from Powell to IM-Pulse. Fourth, that the Joint Checks did not allow IMPulse to obtain more than it would have received in a Chapter 7 liquidation, as required by 11 U.S.C. § 547(b)(5), because the contract would have been assumed in a Chapter 7 proceeding.

The Litigation Trustee argued that the Plan only prevented him from pursuing preferences against creditors whose contracts had been assumed *before* the Plan was confirmed. He similarly argued that any post-confirmation contract assumption negotiated only between the Reorganized Debtor and IMPulse could not divest the Litigation Trustee of a litigation claim against IMPulse that had been assigned to him by the Plan. The Litigation Trustee also argued that the Joint Checks were in fact property of the estate and that IM-Pulse received more than it would have in a Chapter 7 liquidation, at least in part because the contract in question was not executory and thus could not be assumed.

**CONCLUSIONS OF LAW**

**I.**

*NEITHER THE PLAN NOR THE RELEASE AGREEMENT BARS THE LITIGATION TRUSTEE FROM BRINGING THIS PREFERENCE ACTION*

■ 1. As creatures of the Plan, the Reorganized Debtor and the Litigation Trust are governed by the terms of the Plan in the exercise of their rights and powers. The Plan assigned to the Litigation Trustee all litigation trust claims, including all preference actions; however, the Plan did not assign to him claims against a creditor "whose claim was paid pursuant to orders authorizing the assumption of executory contracts or unexpired leases and orders authorizing the payment of certain pre-petition obligations to critical vendors and service providers." Plan, § I.A.1.88. Accordingly, the Court must resolve the dispute as to this provision, that is, whether the Plan divested the Litigation Trustee of claims against a party to a contract that was assumed by the debtor post-confirmation. This opinion holds that it did not.

2. The Court interprets the Plan according to its plain meaning. The Court finds that in order for a preference claim not to have been assigned by the Plan to the Litigation Trustee, the contract upon which the payments were made must have been assumed before the Plan was confirmed. To hold otherwise would empower the Reorganized Debtor to divest the Litigation Trustee, and thus the unsecured creditors, of assets that were assigned to the Litigation Trustee by a Plan that was approved by the unsecured creditors. Such an outcome would mean that the Reorganized Debtor would be able to dilute the assets of the Litigation Trust without the consent of, or over the objection of the Litigation Trustee.[3] Given the separation of the two entities and the ambiguity of the language in the Plan, the presumption is that there is no such authority conferred and the provision in question should be strictly construed according to the plain meaning of its terms. *See In re L & V Realty Corp.*, 76 B.R. 35, 37 (Bankr.E.D.N.Y.1987) ("In many respects a plan is in the nature of a contract ... disputed provisions should be interpreted in light of general contract princi-

---

**3.** While it is possible that, in certain situations, a plan of reorganization might permit a reorganized debtor to divest a litigation trust of specified preference actions by a post-confirmation contract assumption and cure, such authority should not be presumed.

ples...."); *In re Harvey*, 213 F.3d 318, 321 (7th Cir.2000) (Finding that the provisions of a confirmed plan bind the debtor and creditors in the same manner as a contract); *see also Phoenix Rest. Group v. Proficient Food Co. (In re Phoenix Rest. Group)*, 373 B.R. 541, 552–53 (M.D.Tenn. 2007) (order granting creditor status as critical vendor and giving debtor discretionary authority to pay pre-petition arrears did not preclude later appointed Plan Administrator from pursuing preference action against that creditor); *In re Boomgarden*, 780 F.2d 657, 660 (7th Cir.1985) (it is well recognized that procedural due process applies in bankruptcy proceedings and requires adequate notice and a hearing before an individual may be deprived of his or her property).

■ 3. Therefore, the Reorganized Debtor was without authority through the Release Agreement to divest the Litigation Trustee of the instant preference action. Because the Plan assigned 100% of the legal title to the preference action to the Litigation Trust, no agreement negotiated solely between the Reorganized Debtor and IMPulse could resolve any controversy related to possible preference actions. Litigation Trust Agreement, Declaration of Litigation Trust at 3.[4]

4. Furthermore, even if the Reorganized Debtor had possessed the sole authority to resolve the preference action, the Reorganized Debtor failed to give proper notice to the Litigation Trustee. Federal Rule of Bankruptcy Procedure 6006(c) provides that notice of a motion to assume an executory contract must be given to "parties in interest." Federal Rule of Bankruptcy Procedure 6006. Local Rule 6006–1(a) provides that, at a minimum:

> Parties seeking the assumption, rejection, or assignment of an executory contract or unexpired lease must give notice of the proposed action to: (1) the other party to the executory contract or unexpired lease; (2) any official committee, or in the absence of a committee, to the holders of the ten (10) largest unsecured claims taken from debtor's list filed pursuant to Federal Bankruptcy Rule 1007(d) or Schedule F; (3) the trustee; (4) the United States Trustee; and (5) all parties requesting notice ...

*Id.*

■ 5. The Reorganized Debtor complied with the requirements of Federal Rule of Bankruptcy Procedure 6006 and Local Bankruptcy Rule 6006–1 in filing its motion to assume the contract with Powell by serving the Unsecured Creditors' Committee, as well as various other parties; however, it failed to serve the Litigation Trustee with the motion for a consent order, which sought to assume the contract and effectuate the Release Agreement. While litigation trustees as a class are not included in the list of parties upon whom Local Rule 6006–1 requires service, the Litigation Trustee in the instant case is a party in interest within the purview of Federal Rule of Bankruptcy Procedure 6006(c).[5]

---

4. As the Litigation Trustee correctly points out, each of the cases cited by IMPulse that do not allow a Litigation Trustee to pursue a preference action involve situations where the Litigation Trustee was appointed after claims were settled. *See Feldman v. Trans–East Air, Inc.*, 497 F.2d 352, 355 (2d Cir.1974) (a trustee is bound by the prior actions of the debtor); *Armstrong v. Norwest Bank, Minn., N.A.*

*(In re Trout)*, 964 F.2d 797, 801 (8th Cir. 1992) ("[c]reditors must be able to deal freely with debtors-in-possession, within the confines of the bankruptcy laws, without fear of retribution or reversal at the hands of a *later appointed trustee*.") (emphasis added).

5. The failure of a debtor to serve a motion to assume a contract on another party to the contract will result in the order authorizing

6. Accordingly, this Court holds that the Release Agreement does not bar the Litigation Trustee from bringing the instant complaint.

## II.

### THE JOINT CHECKS ARE NOT RECOVERABLE AS PREFERENCES

7. To be recoverable as preferences, the Joint Checks must have been property of the bankruptcy estate. *See* 11 U.S.C. § 547(b), quoted above.

■ 8. Generally, in a bankruptcy case filed by a subcontractor, a joint check issued by a general contractor to both the subcontractor and its sub-subcontractor constitutes "an interest of the debtor in property" to which Sections 541 and 547(b) apply. *See, e.g., Code Elec., Inc. v. Crampton,* 197 B.R. 807, 809 (E.D.N.C. 1996) (finding that when an owner had no contractual duty to pay a subcontractor directly, a joint check payable to the general contractor and the subcontractor became part of the debtor general contractor's estate); *see also Georgia Pacific*

*Corp. v. Sigma Serv. Corp.,* 712 F.2d 962, 967 (5th Cir.1983).[6]

■ 9. However, the Fourth Circuit has held that when a subcontractor holds the joint check solely in constructive trust for a sub-subcontractor, the joint check does not constitute property of the estate. *Mid–Atlantic Supply, Inc. of Va. v. Three Rivers Aluminum Co. (In re Mid Atlantic Supply Co.),* 790 F.2d 1121, 1126–28 (4th Cir.1986)(citing 11 U.S.C. § 541(d)[7] for the proposition that property over which a debtor owns legal but not equitable title is property subject to a constructive trust and that "the sole permissible administrative act of the trustee or debtor in possession is to pay over or endorse over the property to the beneficiary or beneficiaries of the trust.") (internal citations omitted).

■ 10. The creation of a constructive trust is governed by state law. *See Georgia Pacific Corp., supra* (finding no constructive trust because Mississippi and Arkansas construction law did not provide for the creation of constructive trusts); *see also M & T Elec. Contractors, Inc. v. Capital Lighting & Supply, Inc.,* 267 B.R. 434, 479 (Bankr.D.D.C.2001) (applying Virginia law in finding that no constructive

---

assumption being vacated. *See Matter of Arctic Enters., Inc.,* 16 B.R. 153, 154–55 (Bankr.D.Minn.1981) (holding that even after the appeal period had run, Fed.R.Civ.P. 60(b) allowed vacation of order rejecting lease when no notice was given to assignee of lease); *In re RVP, Inc.,* 269 B.R. 851, 855 (Bankr.D.Idaho 2001) (vacating order on unopposed motion to assume when the motion gave inappropriate notice regarding the amount required to cure the default); *see also In re Rath Packing Co.,* 36 B.R. 979, 986–87 (Bankr.N.D.Iowa 1984) (ordering appropriate notice to be given). Accordingly, a portion of a consent order that divests an unnoticed party of property may also be vacated.

**6.** It is to be remembered that Powell was the general contractor, Comstack (the debtor)

was the subcontractor and IMPulse was the sub-subcontractor on the project.

**7.** Section 541(d) of the Bankruptcy Code provides as follows:

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

trust existed in Virginia construction project).

11. The subcontract between Powell and the debtor declared that it should be governed by Texas law. The sub-subcontract between the debtor and WABCO, which was later assigned to IMPulse, incorporated the terms of the subcontract. Accordingly, the existence of a constructive trust must be determined by Texas law.[8]

12. Case law has held that when funds are not commingled, Texas statutes create a constructive trust in favor of a sub-subcontractor over funds owed to it by a subcontractor. *See, e.g., Cunningham v. T & R Demolition, Inc. (In re ML & Assocs., Inc.)*, 301 B.R. 195, 199 (Bankr. N.D.Tex.2003) (finding that "Section 162.001 makes construction payments ... trust funds," but that the debtor's commingling of funds made the funds lose trust fund status); *Vulcan Materials Co. v. Jack Raus, Inc. (In re HLW Enters. of Tex., Inc.)*, 157 B.R. 592, 597–98 (Bankr. W.D.Tex.1993) (in interpleader action commenced by general contractor, a materialman's claim to moneys owed by a debtor/subcontractor defeated the IRS's tax lien against the subcontractor because the subcontractor's only right to the money was as trustee for the materialman).

13. Because there was no commingling here, the funds represented by the Joint Checks are eligible for a "constructive trust" status under Texas law.

14. While the burden of proof in establishing the existence of a constructive trust is on the party asserting that it exists, *see Canal Corp v. Finnman (In re Johnson)*, 960 F.2d 396, 401–02 (4th Cir. 1992) ("the burden is upon a claimant to prove the existence of an alleged [constructive] trust."), that burden is satisfied by showing that a debtor served as a mere conduit between a general contractor and a sub-subcontractor. *Mid–Atlantic*, 790 F.2d at 1127; *see also Gold v. Alban Tractor Co.*, 202 B.R. 424, 427 (E.D.Mich.1996) (granting summary judgment because debtor subcontractor's lack of control over a joint check issued from general contractor to a sub-subcontractor meant that the

---

**8.** Texas has very specific trust statutes which deal with money held for the benefit of subcontractors and materialmen. *See* TEX. PROP. CODE ANN. § 162.001 *et seq.* Those statutes state as follows:

(a) Construction payments are trust funds under this chapter if the payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state.

(b) Loan receipts are trust funds under this chapter if the funds are borrowed by a contractor, subcontractor, or owner or by an officer, director, or agent of a contractor, subcontractor, or owner for the purpose of improving specific real property in this state, and the loan is secured in whole or in part by a lien on the property.

(c) If a contractor and property owner have entered into a written construction contract for the improvement of specific real property

in this state before the commencement of construction of the improvement and the contract provides for the payment by the owner of the costs of construction and a reasonable fee specified in the contract payable to the contractor, the fee paid to the contractor is not considered trust funds.

TEX. PROP.CODE ANN. § 162.001.

A contractor, subcontractor, or owner or an officer, director, or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds.

TEX. PROP.CODE ANN. § 162.002.

An artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or who furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a beneficiary of any trust funds paid or received in connection with the improvement.

TEX. PROP.CODE ANN. § 162.003.

check was not "property of the estate.");
*Mason v. S. Sanitation, Inc. (In re Underground Storage Tank Tech. Servs. Group, Inc.)*, 212 B.R. 574, 579 (Bankr.E.D.Mich. 1997) (debtor subcontractor's ability to control joint checks issued by a general subcontractor to it and a sub-subcontractor precluded the granting of summary judgment in a preference action against the sub-subcontractor).[9]

15. When there is evidence that a debtor subcontractor did not agree to act as a mere conduit for the payment of joint checks from the general contractor to the sub-subcontractor, summary judgment in favor of the sub-subcontractor must be denied. *See M & T*, 267 B.R. at 472 (denying a third-tier subcontractor's summary judgment motion to preference count because there was a dispute as to whether the second-tier subcontractor agreed to a mechanism by which a first-tier subcontractor would pay the third-tier subcontractor by joint check).

■ 16. The instant case is similar to the *Mid–Atlantic* case, which involved a debtor which subcontracted to install custom-made windows in a condominium construction project and hired a sub-subcontractor to provide the windows. *Mid–Atlantic*, 790 F.2d at 1123. When the sub-subcontractor began to suspect that the debtor was in financial trouble, it insisted on being paid by a joint check payable both to the debtor and to it. *Id.*, 790 F.2d at 1126. The general contractor issued a joint check to both the debtor

and the sub-subcontractor for the full amount that the debtor owed the sub-subcontractor and issued a check solely to the debtor for the rest of the money which it owed to the debtor. *Id.* The function of the debtor was to indorse the joint check and pass it on to the subcontractor. *Id.*, 790 F.2d at 1127. In going forward with the project, the evidence showed that the sub-subcontractor had relied on receiving payments from the general contractor and would not have gone forward otherwise. Based on these facts, the Fourth Circuit affirmed the district court's granting of the sub-subcontractor's motion for turnover of the joint check.

17. As in the *Mid–Atlantic* case, the sub-subcontractor here relied on the separateness of the general contractor's joint checks in going forward with the project and joint checks were issued for the full amounts which the subcontractor owed to the sub-subcontractor. Also, a separate check was made payable solely to the subcontractor for amounts that the general contractor owed to the subcontractor in excess of the amount the subcontractor owed the sub-subcontractor.

18. The evidence here shows that there is no genuine issue of material fact that the debtor held the Joint Checks in a constructive trust. Because the checks were issued by Powell and immediately indorsed over to IMPulse, there was no commingling of funds.

---

**9.** Several courts have held that when there is an independent obligation of the general contractor to pay the sub-subcontractor, there is no preference action when the general contractor pays the sub-subcontractor by joint check payable to both the bankrupt subcontractor and the sub-subcontractor. *See, .e.g., Shaw Inds. v. Gill (In re Flooring Concepts )*, 37 B.R. 957, 961 (9th Cir. BAP 1984) (holding that payments by joint check "by a contract

debtor of a bankrupt to a creditor of the bankrupt do not become part of the bankruptcy estate where there is an independent obligation on the part of the debtor to pay the creditor."); *Zions First Nat'l Bank, N.A. v. Christiansen Bros., Inc. (In re Davidson Lumber Sales, Inc.)*, 66 F.3d 1560, 1568 and n. 9 (10th Cir.1995) (same). Because the Court finds that there is a constructive trust, this argument need not be addressed.

19. The Wharton and Leutwyler affidavits demonstrate that the debtor was involved in the negotiations that resulted in the agreement to pay by joint checks. The debtor then complied with the agreement and indorsed the Joint Checks over to IMPulse until it filed its bankruptcy petition. The Litigation Trustee has not produced any evidence indicating that the debtor was not so involved.

20. The cases cited by the Litigation Trustee in his objections to the affidavits are inapposite. *Kennedy Inn Assocs. v. Perab Realty Corp. (In re Kennedy Inn Assocs.)*, 221 B.R. 704 (Bankr.S.D.N.Y. 1998), cited for the proposition that an affidavit by one party of another party's subjective intent is inadmissible. To the extent that Mr. Leutwyler and Mr. Wharton testify as to the debtor's intent during negotiations, their testimony is indeed inadmissible. However, the affidavits are admissible to the extent that Mr. Leutwyler and Mr. Wharton testify as to the debtor's presence during the negotiations. *See id.* at 710 ("Perhaps it would be different if [affiant] were testifying to a factual occurrence which he observed ..."). The debtor's presence at the negotiations and continued acquiescence in indorsing the Joint Checks demonstrates the debtor's intent to create what amounts to a constructive trust under Texas law.

21. The Litigation Trustee has not raised a genuine issue of material fact to show otherwise. Because the Joint Checks were not property of the estate, the Court need not decide whether IM-Pulse received more than it would have in a Chapter 7 proceeding.

### III

### SUMMARY JUDGMENT STANDARD

22. The standard of review for summary judgment motions is set forth in *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 351 (4th Cir. 2007), as follows:

> In bankruptcy, summary judgment is governed in the first instance by Federal Rule of Bankruptcy Procedure 7056, which expressly incorporates into bankruptcy proceedings the standards of Federal Rule of Civil Procedure 56. A court may award summary judgment only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999); *see also* Fed. R. Civ. Proc. 56(c) (providing that award of summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"). In evaluating a summary judgment motion, a court "must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *Apex Express Corp.*, 190 F.3d at 633. In so doing, a court is not entitled to either weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge...."). If the moving party is unable to demonstrate the absence of any genuine issue of material fact, summary judgment is not proper and must be denied. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986); *Honor v. Booz–Allen & Hamilton, Inc.,* 383 F.3d 180, 185 (4th Cir.2004).

*Id.*

23. Because there are no genuine disputes of any material fact present in the instant case, the defendant is entitled to judgment as a matter of law.

WHEREFORE, the defendant's motion for summary judgment will be GRANTED and the instant complaint will be DISMISSED.

ORDER ACCORDINGLY.